MERCEDES RODRÍGUEZ FIGUEROA, recurrente, *v.* EL REGISTRADOR DE LA PROPIEDAD DE GUAYAMA, recurrido.

Número 1297.

*Sometido:* 9 de julio de 1953. *Resuelto:* 30 de diciembre de 1953.

*Víctor M. Pons,* abogado de la recurrente; el Registrador recurrido compareció por escrito.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del tribunal.

El día 8 de diciembre de 1952 el Registrador de la Propiedad de Guayama denegó la inscripción de una Resolución del Tribunal Superior, Sala de Caguas, de fecha 7 de octubre de 1952, en virtud de la cual se declara justificado en favor del recurrente el dominio de parte de una finca rústica localizada en el Barrio Quebradillas de Barranquitas, dentro del antiguo distrito judicial de Guayama. La nota denegatoria se basó en el criterio del Registrador al efecto de que tal finca

radica "en un partido territorial distinto a aquél en que se tramitó el expediente, o sea, la Sala de Caguas del Tribunal Superior de Puerto Rico, la cual no tiene competencia en dicho procedimiento". El peticionario en el expediente de dominio Mercedes Rodríguez Figueroa a cuyo favor se dictó la resolución ya mencionada ha interpuesto un Recurso Gubernativo ante este Tribunal, en que interesa la revocación de la nota denegatoria ya mencionada.

El Registrador recurrido invoca el artículo 395 de nuestra Ley Hipotecaria, que dispone que un expediente de dominio se tramitará ante el "Juez de primera instancia del partido en que radiquen los bienes". El recurrente alega que bajo el nuevo sistema judicial prevaleciente en Puerto Rico, en virtud de las disposiciones de la Constitución del Estado Libre Asociado de Puerto Rico y de la Ley de la Judicatura de 24 de julio de 1952, existe un solo Tribunal unificado de Primera Instancia, con una sola jurisdicción, quedando constituído el Estado Libre Asociado en un solo distrito judicial y habiéndose eliminado toda diferencia jurisdiccional entre las diversas salas de ese único tribunal, y que, por lo tanto, todas y cada una de esas salas tienen competencia para entender en un expediente de dominio, independientemente del sitio, en Puerto Rico, donde esté localizada la propiedad. En cuanto al artículo 395 de la Ley Hipotecaria, alega el recurrente que Puerto Rico hoy en día constituye un solo "partido".

Este recurso gubernativo plantea cuestiones fundamentales en cuanto a los efectos de la nueva Ley de la Judicatura. Señalemos en el inicio de la discusión que bajo el nuevo sistema judicial se mantienen las anteriores categorías en cuanto al lugar del juicio (*venue*), de acuerdo con la conveniencia procesal y la conveniencia de las partes y de los testigos. La Ley de la Judicatura, en sus secciones 13 y 18, establece los objetivos generales y las normas directrices en cuanto a la sala o sección que sea la más apropiada y conveniente para conocer en determinada clase de casos. Es cierto que bajo nuestra Constitución y bajo la Ley de la Judicatura

se establece un sistema judicial unificado; en que se eliminan las viejas diferencias jurisdiccionales entre los tribunales o salas o secciones de tribunales, eliminándose los problemas técnicos de jurisdicción y destruyéndose las consecuencias inexorablemente fatales de la ausencia de jurisdicción, y que cualquier caso puede radicarse, adjudicarse y tramitarse en cualquier sala o sección del Tribunal de Primera Instancia, sin que sea nula la sentencia que se dicte por la sala o sección donde se haya tramitado el caso, aunque esa sala o sección no sea la más conveniente, siendo válida la sentencia si las partes han convenido, con la aprobación del Juez, que ese caso se vea en esa sala o sección.   Pero el hecho de que la sentencia no sea nula, no implica el que los jueces en general, como cuestión práctica, dejen de asumir la responsabilidad de velar por que los casos se vean en la sala más conveniente y apropiada, de acuerdo con las normas generales y directrices contenidas en las secciones 13 y 18 de la Ley de la Judicatura. Esa alta responsabilidad puede cumplimentarse a través del ejercicio de la facultad de trasladar los casos a la sala o sección más conveniente o apropiada, o del ejercicio efectivo del poder judicial de no aprobar convenios de sumisión que sean contrarios a la eficiencia procesal y a la verdadera conveniencia de las partes y de los testigos.   Naturalmente, en la comprobación de cuál es la conveniencia de las partes, el convenio de ellas, expreso o implícito, a través de la sumisión, debe ser de primordial y notable importancia, en el ejercicio de la discreción del Juez, a menos que tal convenio sea claramente contrario a la conveniencia procesal.

■■ Después de tal discusión introductoria, consideremos los méritos de este caso.   Pero se hace preciso el definir previamente los conceptos.   El término "jurisdicción" significa el poder o autoridad de un tribunal para considerar y decidir casos o controversias.(1)   14 Am. Jur. 363; 21 C.J.S.

---

(1) Es el poder para "decir" cuál es la ley, esto es, "juris-dico" o "juris-dicto" o "jus-dicere". *Long Flame Coal Co.* v. *State*, 163 S. E. 16, 19; *Atwood* v. *Cox*, 55 P.2d 377, 380; *Barrs* v. *State*, 97 S. E. 86; *Johnston* v. *Hunter*, 40 S. E. 448; *In re Woodside-Florence Irr. Dist.*, 194 P.2d 241, 244.

28; *United States* v. *Arredondo*, 6 Pet. 691, 708; *Daniels* v. *Tearney*, 102 U. S. 415; *Petty & Co.* v. *Dock Contractors Co.*, 283 Fed. 338; y véase, *Words and Phrases*, Vol. 23, pág. 358 *et seq.*, edición permanente y Suplemento de 1953, pág. 140 *et seq.* De otro lado, el concepto de lugar del juicio o "venue" se refería al sitio o lugar específico donde debe ejercitarse ese poder, o sea, la localidad del juicio, desde el punto de vista de la conveniencia de los litigantes y de los testigos, siendo tal concepto uno de distribución geográfica o territorial del ejercicio del poder de adjudicación. *Neirbo Co.* v. *Bethlehem Corp.*, 308 U. S. 165; 21 C.J.S. 33; 67 C. J. 11, 12; *Southern Sand & Gravel Co.* v. *Massaponax S. & G. Corp.*, 133 S. E. 812; *Words and Phrases*, Vol. 23, pág. 401, edición permanente y Suplemento de 1953, pág. 153.

En *Arganbright* v. *Good*, 116 P.2d 186, 46 Cal. App.2d 877, citando de *Paige* v. *Sinclair*, 130 N. E. 177, 178, 237 Mass. 482, se dice lo siguiente:

"Jurisdicción es un término de amplia significación. Se refiere a, y define el poder de los tribunales. Incluye cualquier clase de acción judicial que tenga contacto con la materia de una acción, pleito, petición, demanda, acusación u otro procedimiento. Incluye el poder de investigar hechos, aplicar la ley, formular decisiones y dictar sentencias. ... Lugar del juicio o (*venue*) en su sentido moderno y local, se refiere a, y define el condado o área territorial o distrito dentro del estado en que la causa debe tramitarse y juzgarse. Generalmente se refiere a subdivisiones geográficas, guarda relación con la práctica o el procedimiento, puede ser renunciado y no se refiere en absoluto a la jurisdicción de los tribunales."

En síntesis, la diferencia entre jurisdicción y el lugar del juicio está coordinada con la diferencia entre el poder de una corte y la conveniencia de los litigantes, los tribunales y los testigos (*Neirbo Co.* v. *Bethlehem Corp.*, supra, a la pág. 168), lograda tal conveniencia a través de la selección de la corte más apropiada, sujeto a la voluntad de las partes, en cuanto a las reglas del lugar del juicio. De un lado, el concepto técnico de poder judicial y, de otro lado, el postulado

realista de conveniencia procesal a los fines de asegurar una eficiente administración de justicia. 20 Minn. L. Rev. 617, 648. Tanto desde el punto de vista de su origen histórico en Inglaterra (48 Mich. L. Rev. 1) como de su desarrollo en los Estados Unidos, los conceptos de "venue" se han basado exclusivamente en la conveniencia de los tribunales, de los litigantes y de los testigos. 49 Mich L. Rev. 307; "Venue Statutes: Diagnosis and Proposed Cures", 43 Harv. L. Rev. 1217; "Place of Trial in Civil Actions", 25 Tulane L. Rev. 399.

De las definiciones mencionadas surgen las siguientes consecuencias, en aquellas jurisdicciones en que prevalece la distinción señalada:

(1) La ausencia de jurisdicción envuelve un defecto radical que implica la nulidad absoluta de una sentencia, que no queda subsanada por la sumisión de las partes. De otro lado, la falta de "venue" no apareja la nulidad del fallo, si ha mediado la sumisión expresa o tácita del interesado o de los litigantes.

(2) El poder jurisdiccional es esencial a la validez de los procedimientos, y no puede ser renunciado por las partes. Las reglas en cuanto al lugar del juicio, constituyen un privilegio personal de los interesados, que puede ser renunciado por ellos, ya sea expresamente o a través de una sumisión tácita al acudir a determinado tribunal incompetente o al no plantear oportunamente la cuestión. *Neirbo Co.* v. *Bethlehem Corp*, supra, a la pág. 168.

## LA REFORMA EN PUERTO RICO

■ Atendiendo probablemente a los postulados arriba señalados, al deseo de eliminar obstáculos técnicos al logro de la justicia sustancial y al propósito de establecer un sistema más eficiente de administración de justicia, se ha efectuado en nuestra isla una notable reforma judicial. El movimiento de renovación se inició con la Ley núm. 432, aprobada el 15 de mayo de 1950 (Leyes de 1949–50, pág. 1127). Aunque mantuvo la diferencia relativa a sus respectivos poderes, sin

embargo, se creó un solo y único Tribunal de Distrito y un solo y único Tribunal Municipal, con distintas salas y secciones. El artículo 3 de esa Ley disponía lo siguiente:

"Artículo 3.—*Distrito Judicial.*—Por la presente el territorio de Puerto Rico se constituye en un distrito judicial.

"Los tribunales de justicia ejercerán su jurisdicción sobre la totalidad del territorio comprendido en dicho distrito judicial."

Interpretando el anterior artículo, se resolvió, en *Figueroa* v. *Tribunal de Distrito*, 72 D.P.R. 24, 28, 29, lo siguiente:

". . . A virtud de los anteriores preceptos es obvio que el Juez de la Sala de Toa Alta del Tribunal Municipal de Puerto Rico estaba autorizado para librar una orden de allanamiento para ser diligenciada en Bayamón. Ello es así porque, como hemos visto, en la actualidad y a virtud de la Ley 432 supra sólo existe en toda la Isla de Puerto Rico un distrito judicial; porque los tribunales de justicia . . . ejercen su jurisdicción sobre la totalidad del territorio comprendido en dicho distrito judicial . . ."

Aplicando la misma disposición, se resolvió en *Martínez* v. *Vda. de Morales*, 72 D.P.R. 210, que un emplazamiento en cualquier parte de Puerto Rico, se hacía, bajo dicha Ley 432, dentro del único distrito existente de Puerto Rico, y el demandado sólo tenía 10 días después del emplazamiento para alegar, resolviéndose que la regla 12 (*a*) y el artículo 89 (3) del Código de Enjuiciamiento Civil, en tanto disponían 20 días para alegar luego de ser emplazado un demandado fuera del distrito en que se instaba la acción, pero dentro de la Isla de Puerto Rico, se habían hecho superfluos por la Ley 432, que creaba un solo distrito.

La nueva Constitución del Estado Libre Asociado de Puerto Rico eliminó taxativamente el concepto de jurisdicción que prevalecía anteriormente, eliminándose en nuestra ley fundamental las anteriores diferencias jurisdiccionales. La Sección 2 del Artículo 5, que trata del Poder Judicial, dispone lo siguiente:

"Sección 2.—Los tribunales de Puerto Rico constituirán un sistema judicial unificado en lo concerniente a jurisdicción, fun-

cionamiento y administración. La Asamblea Legislativa, en cuanto no resulte incompatible con esta Constitución, podrá crear y suprimir tribunales, con excepción del Tribunal Supremo, y determinará su competencia y organización." (²)

Refiriéndose a esta sección, en el informe de la Comisión de la Rama Judicial de la Convención Constituyente de Puerto Rico se determina, en forma clara y paladina, la eliminación de las reglas de jurisdicción, indicándose, en parte, lo siguiente:

"Esta sección establece la completa unificación de los tribunales de Puerto Rico. *La unificación de los tribunales produce, entre otros efectos, la eliminación de problemas técnicos de jurisdicción.* El poder legislativo queda, no obstante, facultado para determinar la competencia de los tribunales y para disponer que de acudir un litigante a un tribunal distinto al indicado por las leyes sobre competencia, la parte contraria puede solicitar y obtener el traslado de la causa, o el tribunal motu proprio puede así disponerlo. La Asamblea Legislativa queda asimismo facultada para autorizar la revisión judicial de resoluciones sobre traslados.

"La Comisión recomienda la adopción de este sistema integrado a los fines de asegurar el logro de los siguientes objetivos:

"1. La mayor eficiencia en el ejercicio del Poder Judicial.

"2. Una distribución equitativa del trabajo de las cortes que permita la mayor rapidez en los procedimientos judiciales evitando la congestión de causas pendientes en los tribunales.

"3. Énfasis en el principio de especialización de jueces en lugar de la especialización de tribunales, evitándose así la necesidad de tribunales o salas adicionales o de crear un número excesivo de plazas de jueces.

"4. Reducción del costo por caso al erario público.

"5. La mayor flexibilidad en la administración de la justicia.

"*Este sistema judicial integrado que recomendamos eliminará en los litigios las cuestiones técnicas de jurisdicción.* Dentro del sistema que hasta ahora ha prevalecido en Puerto Rico a menudo se derrotaban los fines de la justicia y se perjudicaban irremediablemente los derechos de litigantes por haber éstos acudido a tribunales que según dicho sistema carecían, por razones sumamente técnicas, de jurisdicción para conocer en su causa. Fre-

---

(²) En su texto inglés, la sección 2 de nuestra Constitución identifica "competencia" con "venue".

cuentemente se descubría el error técnico cuando ya el litigante había incurrido en gastos y pérdida de tiempo. *El establecimiento de este sistema judicial unificado que se recomienda eliminará de manera absoluta todas estas deficiencias. Por otro lado, se reserva al Poder Legislativo la facultad de disponer por ley sobre la competencia de los tribunales incluyendo el lugar donde deben ventilarse los litigios. Un error por razón de competencia podrá siempre ser subsanado a petición de las partes o por disposición del tribunal sin que se perjudiquen fatalmente los derechos de los litigantes.*

"También se reserva al Poder Legislativo la facultad de crear nuevos tribunales o de abolir los existentes con excepción del Tribunal Supremo.

*"Precedentes:* La Comisión utilizó como precedentes directos para esta sección el artículo VI de la Constitución de Nueva Jersey y la Ley de la Judicatura de Inglaterra de 1873 y 1875. Se consultaron y adoptaron recomendaciones contenidas en las siguientes obras: Pound, R.; *Organization of Courts* 1940; Willoughby, W. F.: *Principles of Judicial Administration,* 1929; Pirsig, N. E.: *Cases and Materials on Judicial Administration,* 1946; Patterson, C. P.: *Administration of Justice in Great Britain,* 1936; Jackson, R. M.: *The Machinery of Justice in England,* 1940; McCormick: *A Proposed Organization of the Illinois Judiciary,* 29 Ill.L.Rev. 31 (1934); McCormick: "Modernizing the Texas Judicial System", 21 Texas L. Rev. 673 (1943). También se estudiaron las publicaciones del *"Journal of the American Judicature Society".* Se sigue también ·en cuanto a esta sección la recomendación específica del "American Bar Association" sobre unificación de tribunales. Véase al efecto: Vanderbilt, A. T.: *Minimum Standards of Judicial Administration,* 1949, pág. 29.

"En otros estados, además de Nueva Jersey, existen elementos del sistema integrado, especialmente en California, Connecticut, Maryland y Missouri. El propio sistema judicial de Puerto Rico con anterioridad a 1898 revelaba algunas de las características fundamentales del sistema unificado de tribunales. Señalamos además que en 1950 la Asamblea Legislativa de Puerto Rico dispuso la unificación en sus distintos niveles de los tribunales de distrito incluyendo el Tribunal de Contribuciones y el Tribunal de Expropiaciones, así como de los tribunales municipales y los juzgados de paz." (Bastardillas nuestras.)

En el hemiciclo de la Convención Constituyente el Presidente de la Comisión de la Rama Judicial, Lic. Ernesto Ramos Antonini, al explicar los objetivos de la proposición sometida por ese Comité, dijo, en parte, lo siguiente:

La independencia del Poder Judicial se garantiza, a nuestro juicio, según la proposición, mediante alrededor de diez características que contiene el proyecto.

"Una es la ya mencionada de la integración. Actualmente, el sistema de organización de cortes, tal como rige actualmente, y especialmente en lo relativo a las Cortes Municipales, y hasta cierto grado, a las Cortes de Distrito, funcionan, en gran parte, como células; más bien que como células, como órganos separados e independientes. No es una sola organización. Consideramos que el sistema vigente se presta más a que las cortes funcionen un poco más desintegradamente de un poder judicial central, que debe dar la tónica de la función del poder judicial en nuestra sociedad." (*Diario de Sesiones de la Convención Constituyente,* pág. 172.)

En la obra: "Notes and Comments on the Constitution of the Commonwealth of Puerto Rico", se dice, a la página 87, lo siguiente, comentando la Sección 2 del Artículo 5:

"Los fines fundamentales de esta sección son: (1) la rápida disposición de los casos y (2) el logro de decisiones sobre los méritos, y no a base de tecnicismos de jurisdicción. Tal realización se ha hecho posible por la disposición al efecto de que los tribunales constituían un sistema judicial unificado.

"El aspecto más importante de esa disposición es la unificación de las cortes a los fines de jurisdicción. Actualmente, no es completamente clara la jerarquía de las cortes en Puerto Rico, inferiores al Tribunal Supremo (jueces de paz y cortes de distrito y municipales) : cada corte tiene jurisdicción sobre los casos señalados por ley, con el resultado de que el problema en cuanto a qué corte tiene jurisdicción en un caso determinado, es, con frecuencia, técnico y complicado.

"La sección 2 elimina molestos problemas de jurisdicción mediante la unificación del sistema judicial.

"La integración de los tribunales en algunos estados se ha efectuado mediante la creación de un tribunal general, con divi-

siones apelativas y de celebración de juicios. Aunque la sección 2 no usa esa técnica, los resultados prácticos son equivalentes."

La Ley de la Judicatura (Ley núm. 11 de 24 de julio de 1952 ((2) pág. 31)), se aprobó con el propósito de dar cumplimiento al mandato constitucional. Dispone, en parte, lo siguiente:

"Sección 1.—*Poder Judicial del Estado Libre Asociado de Puerto Rico.*

"El poder judicial del Estado Libre Asociado de Puerto Rico residirá en un sistema judicial unificado en lo concerniente a jurisdicción, funcionamiento y administración compuesto por el Tribunal Supremo como tribunal de última instancia, y por el Tribunal de Primera Instancia, los que conjuntamente constituirán el Tribunal General de Justicia.

"El Estado Libre Asociado de Puerto Rico queda por la presente constituído en un solo distrito judicial, sobre todo el cual el Tribunal General de Justicia ejercerá su poder y autoridad.

". . . . . . . .

". . . . . . . .

"Sección 9.—*Organización del Tribunal.*

"El Tribunal de Primera Instancia se compondrá de dos secciones, una que se conocerá como Tribunal Superior y otra que se conocerá como Tribunal de Distrito. Cada sección será un tribunal de récord y estará constituída y desempeñará las funciones que más adelante se indican.

"Sección 10.—*Jurisdicción y Competencia Conservadas.*

"El Tribunal de Primera Instancia es un tribunal de jurisdicción original general, con autoridad para actuar a nombre y por la autoridad del Estado Libre Asociado de Puerto Rico, en todo procedimiento civil o criminal, según más adelante se dispone. Toda acción civil o criminal se presentará en aquella sala del Tribunal situada en el territorio en que la misma hubiese sido radicada bajo la legislación en vigor hasta el presente, pero no se desestimará ningún caso fundado en haberse sometido a una sección sin jurisdicción o autoridad o a una sala de un tribunal sin competencia para ello. Todo caso podrá ventilarse en la sección o sala en que se radique, por convenio de las partes y la anuencia del juez que presida dicha sala en ese momento, o, de

no ser así oído, será transferido por orden del juez a la sección o sala correspondiente, de conformidad con las reglas que el Tribunal Supremo adoptare.

"

.            .            .            .            .            .            .            .

"Sección 13.—*Competencia.*

"El Tribunal Superior conocerá de los siguientes asuntos:

"(*a*) En lo civil:

"

.            .            .            .            .            .            .            .

"4. De todo recurso, acción y procedimiento, incluyendo testamentarías, divorcios, y recursos legales especiales y extraordinarios, en relación con los cuales el Tribunal de Distrito de Puerto Rico tenía jurisdicción para la fecha en que esta Ley entre en vigor.

"5. De todo otro asunto civil en que la cuantía en controversia, reclamación legal o valor de la propiedad en disputa, exceda de dos mil quinientos dólares ($2,500), sin incluir intereses, costas y honorarios de abogado."

"Sección 18.—*Competencia.*

"El Tribunal de Distrito conocerá de los siguientes asuntos:

"(*a*) En lo civil:

"1. De todo asunto de que la corte municipal existente al tiempo de la vigencia de esta Ley podía conocer exclusiva o concurrentemente.

"2. De todo otro asunto civil en que la cuantía en controversia, reclamación legal o valor de la propiedad en disputa, no exceda de dos mil quinientos (2,500) dólares, sin incluir intereses, costas y honorarios de abogado, excepción hecha de aquellos asuntos especificados en la Sección 13(*a*), 2, 3 y 4 de esta Ley, de que puede conocer el Tribunal Superior.

"(*b*) En lo criminal:

"1. De toda causa por delito menos grave, excepción hecha de aquéllas de que al presente la corte municipal no podía conocer.

"2. De toda infracción de estatutos o de ordenanzas municipales, cuya ejecución había sido conferida exclusiva o concurrentemente a la corte municipal o a la de paz."

Como se ve, en la Ley de la Judicatura se establecen, en parte, los siguientes postulados:

(1) Que los recursos, procedimientos y acciones que previamente se veían en el anterior Tribunal de Distrito o en la anterior Corte Municipal deberían continuar siendo conocidos, como norma general, judicialmente saludable, en la misma sección del Tribunal de Primera Instancia donde antes se veían, aunque la infracción de esta norma no produzca efectos fatales de nulidad de la sentencia que se dicte, habiéndose eliminado el concepto de invalidez de la sentencia por falta de jurisdicción.

(2) Sujeto a la norma general de preferencia práctica arriba señalada, cualquier caso, acción o procedimiento puede ser radicado en cualquier sala o sección del Tribunal de Primera Instancia, y la sentencia que se dicte sería válida si ha mediado el convenio de las partes y la aprobación del Juez correspondiente.

(3) Se establece un solo Tribunal General de Justicia y un solo Tribunal de Primera Instancia, que ejercitan su poder y autoridad sobre el Estado Libre Asociado de Puerto Rico, que queda constituído en un solo distrito judicial, esto es, se establece una sola jurisdicción judicial.

(4) Existiendo un único Tribunal de Primera Instancia en un solo distrito judicial, se han eliminado cualesquiera posibles diferencias *jurisdiccionales* entre las distintas salas y secciones que integran este Tribunal. Clark and Rogers; "The New Judiciary Act of Puerto Rico", 61 Yale L. J. 1147, 1155 *et seq.*

(5) Ninguna sentencia o resolución es automáticamente nula por el hecho de que se haya dictado sin jurisdicción, y "no se desestimará ningún caso fundado en haberse sometido a una sección sin jurisdicción o autoridad o a una sala de un tribunal sin competencia para ello".

(6) El poder judicial queda suplido por la sumisión expresa o tácita de las partes, eliminándose la regla anterior al efecto de que un defecto jurisdiccional no queda subsanado por la sumisión de las partes. Bajo la nueva ley la objeción

en cuanto a la ausencia de poder judicial constituye un privilegio personal que puede ser renunciado por los litigantes. ([3])

Otra consecuencia fundamental de la reforma judicial establecida por nuestra Constitución y por la Ley de la Judicatura consiste en que los antiguos conceptos de jurisdicción por razón de la cuantía y de la materia han sido separados de ese marco jurisdiccional y han sido colocados en la nueva categoría de "venue" o competencia. En otras palabras se ha ampliado el concepto de "venue" para que incluya, dentro de su definición, de sus fronteras jurídicas y de sus consecuencias legales, los postulados relativos al poder o facultad de los tribunales por razón de materia o cuantía. Lo que antes era jurisdiccional se convierte ahora en asunto propio de "venue" o competencia. Por ejemplo, cualquier caso puede tramitarse ante cualquier sala o sección del Tribunal de Primera Instancia, siendo válida la sentencia que se dicte, independientemente de la cuantía envuelta o de la materia objeto del procedimiento, si ambas partes han convenido en someterse, expresa o implícitamente, a la competencia de esa sala o sección, siempre y cuando que haya mediado la anuencia del juez que presida esa sala.

## EL EXPEDIENTE DE DOMINIO

Después de la discusión general anterior relativa al colapso constitucional y legislativo del concepto de jurisdicción en Puerto Rico, tal como ese concepto se entendía an-

---

([3]) Los anteriores seis postulados surgen también de la discusión de nuestra reforma judicial contenido en las siguientes autoridades: Juez Presidente del Tribunal Supremo de Puerto Rico, Hon. A. Cecil Snyder: "New Puerto Rico Judicial System is Modern and efficient", *Journal of American Judicature*, Vol. 36, number 5, February 1953, pág. 134; Juez Presidente Sr. Snyder: "Puerto Rico Modernizes Courts", *National Municipal Review*, Vol. 42, Núm. 1, enero 1953, pág. 11; Informe oral del Juez Clark en la vista pública sobre la Ley de la Judicatura, celebrada el 21 de julio de 1952 ante las Comisiones Conjuntas de lo Jurídico Civil, del Senado y de la Cámara de Representantes de Puerto Rico; Informe oral en la misma ocasión de Víctor Gutiérrez Franqui, entonces Procurador General; Víctor Gutiérrez Franqui y Henry Wells: "The Commonwealth Constitution", *Annals of the American Academy of Political and Social Science*, January 1953, pág. 33, 40.

teriormente, procede el discutir el efecto de tal renovación jurídica en cuanto a las circunstancias específicas de este caso. El artículo 395 de nuestra Ley Hipotecaria dispone, en parte, que un expediente de dominio se tramitará presentando un escrito "al Juez de primera instancia del partido en que radiquen los bienes". En el caso de *Nazario v. El Registrador de la Propiedad*, 16 D.P.R. 668, se resuelve que, bajo el citado artículo 395, se concede jurisdicción *exclusiva* sobre un expediente de dominio al "Juez de Distrito" del partido o distrito judicial en que radiquen los bienes, no admitiéndose sumisión en contrario en otra "Corte de Distrito", ya que se trataría de un defecto jurisdiccional que anula de raíz una resolución aprobatoria de tal expediente dictada por una "Corte de Distrito" distinta a aquélla del distrito donde radican los bienes, no quedando subsanado tal vicio radical por el hecho de que el peticionario haya acudido a otra corte, sometiéndose a la facultad de esta última. Señala este Tribunal en el caso de Nazario que no se trata de pleitos contenciosos en que pueda haber sumisión de los litigantes, sino que un expediente de dominio envuelve una gestión *ex-parte* de un solo interesado, y que la voluntad unilateral de ese interesado no debe menoscabar el principio de jurisdicción exclusiva encarnado en el artículo 395. Dice además este Tribunal que "allí donde está la tierra, allí donde es natural que residan los que puedan tener intereses opuestos a los del peticionario: allí es donde deben tramitarse a las claras, con la mayor publicidad que sea posible dentro de la ley, los expedientes de esta naturaleza."

Algunos de los comentaristas españoles de la Ley Hipotecaria coinciden, independientemente, con el criterio sentado en el caso de Nazario, al efecto de que la ausencia de "jurisdicción exclusiva" en cuanto a un expediente de dominio no puede ser suplida por la sumisión del peticionario, tratándose de un defecto esencial de jurisdicción que anula absolutamente el procedimiento. Morell, Legislación Hipotecaria, Tomo 5, pág. 454, 532: "En actos de jurisdicción voluntaria . . . admi-

tir competencia por razón de sumisión expresa equivale a borrar las reglas de competencia marcadas para cada caso en la ley, sustituyéndolas por la exclusiva voluntad del interesado." Véase además Roca Sastre, Derecho Hipotecario, Tomo 2, pág. 489: "No cabe sumisión de ninguna clase, pues la competencia del juzgado se determinará exclusivamente por la situación de los bienes."

Cabe formular ciertas observaciones en cuanto a la doctrina sentada en el caso de *Nazario* v. *El Registrador de la Propiedad*, supra, y exteriorizada por los citados comentaristas. No hay dudas al efecto de que el artículo 395 señala que el expediente de dominio debe tramitarse en la corte del distrito judicial donde radican los bienes. Pero el problema es al efecto de si la facultad de tal corte era tan exclusiva que se convirtiese en un requisito jurisdiccional inexorable que no quedase subsanado por la sumisión del interesado. Desde ese punto de vista, es relevante señalar que la opinión de los citados comentaristas fué afectada notablemente por el hecho de que el antiguo artículo 505 del Reglamento de la Ley Hipotecaria de España (4) señalaba que la competencia de los juzgados que hubiesen de entender en un expediente de dominio "se determinará *exclusivamente* por la situación de los bienes objeto de la información". (Bastardillas nuestras.) Al aprobarse el Reglamento para la Ejecución de la Ley Hipotecaria en Puerto Rico, no se incorporó a nuestro Reglamento el artículo 505, ni se indicó, en la Ley o en el Reglamento, que tal competencia fuese exclusiva. El artículo 395 le concede competencia al tribunal de primera instancia del partido donde estén situados los bienes. Ya hemos visto que, bajo la nueva Constitución, la Ley de la Judicatura crea un solo Tribunal de Primera Instancia, con jurisdicción original ge-

(4) En el año 1946 se aprobó una nueva Ley Hipotecaria en España y un nuevo Reglamento. El artículo 201 de la nueva ley dispone que será juez competente, en un expediente de dominio, el de primera instancia del partido en que radiquen los bienes. El artículo 273 del nuevo Reglamento dispone que tal competencia se determinará exclusivamente por la situación de los bienes. Medina y Marañon, Leyes Civiles de España, Ley y Reglamento Hipotecario, pág. 118 y 226.

neral, en un solo distrito judicial. Esto es, existe un solo "partido" que comprende la totalidad de Puerto Rico y si los bienes están situados en ese único "partido" de Puerto Rico, cualquier sala del Tribunal de Primera Instancia podría considerar un expediente de dominio, en forma compatible con el artículo 395 de la Ley Hipotecaria.(5)

Como hemos visto, la Ley de la Judicatura señala que no debe desestimarse un caso por haberse sometido a una sección sin jurisdicción o autoridad o a una sala de un tribunal sin competencia para ello. En cuanto a expedientes de dominio, ello significa que la facultad de determinada sala no es exclusiva, y que la resolución aprobatoria del expediente no es nula, aunque se tramite en cualquier sala, disponiéndose además que todo caso podrá ventilarse en la sección o sala en que se radique, por convenio de las partes y la anuencia del juez que la presida. Todo ello hace inefectiva la doctrina sentada en el caso de *Nazario* v. *Registrador*, supra. La Ley de la Judicatura admite la sumisión en contrario, que le imprime validez a una resolución, aun si ella se ha dictado sin jurisdicción o competencia. Siendo aplicable la Ley de la Judicatura a expedientes de dominio, ninguna sala del Tribunal de Primera Instancia tiene facultad exclusiva sobre tales expedientes, y al acudir el peticionario a cualquier sala, ello implica una sumisión que le imprime validez a tal resolución.

Se podría alegar que la Ley de la Judicatura no es aplicable a procedimientos *ex parte*. El expediente de dominio es *ex parte* (*Benítez* v. *Registrador*, 71 D.P.R. 563, 568, 569),

(5) El Registrador recurrido alega que, bajo el artículo 413 de la Ley Hipotecaria, ningún artículo de esa ley podrá ser derogado sino en virtud de otra ley especial, y que, por lo tanto, el artículo 395 no debe ser considerado como derogado por la Ley de la Judicatura. Pero no estamos resolviendo que se haya efectuado tal derogación. El artículo 395 habla del juez del partido donde estén situados los bienes. Le corresponde a otras leyes el definir la extensión y linderos de un "partido" judicial, o sea, el territorio sujeto al poder de un tribunal. (Enciclopedia Jurídica Española, Tomo 24, pág. 422.) Bajo la Ley de la Judicatura el "partido" es un solo distrito judicial que comprende todo el territorio de Puerto Rico. Esa ley no deroga, sino que define, los contornos del artículo 395.

mientras no se promueva cuestión alguna entre partes conocidas y determinadas. Cf. *Rivera* v. *Corte*, 68 D.P.R. 673. Pero no hay nada en la ley citada que excluya de su aplicación los procedimientos *ex parte*. Por el contrario, la sección 10 ya mencionada es aplicable, expresamente, a todo procedimiento y a toda acción civil o criminal. Las disposiciones en cuanto a un sistema judicial unificado en lo concerniente a jurisdicción y en cuanto a la existencia de un solo Tribunal de Primera Instancia, con jurisdicción original general sobre un solo distrito judicial, son de aplicación general, y los procedimientos *ex parte* no quedan excluídos de tal sistema judicial unificado. Es cierto que la sección 10 dispone, en parte, que todo caso podrá ventilarse en la sección o sala en que se radique, *"por convenio de las partes* y la anuencia del juez que presida dicha sala en ese momento", (bastardillas nuestras) y que en un procedimiento *ex parte* no puede haber partes en oposición que puedan llegar a un convenio bilateral.

██ Resolviendo el último problema planteado en una forma realista, en un expediente de dominio deben citarse a los anteriores dueños, al ministerio fiscal, a los colindantes y aquellos que pudiesen tener algún derecho sobre la finca. Morell, ob. cit., Tomo 5, pág. 530, 531, 536; Roca Sastre, ob. cit., Tomo 2, pág. 493, 494; Cf. *Maldonado* v. *Registrador*, 53 D.P.R. 929; *Pozzi* v. *Registrador*, 40 D.P.R. 854; *Rivero et al* v. *Hernández, et al*, supra; *Colón et al* v. *Registrador*, 23 D.P.R. 754; *Calderón et al* v. *García*, 14 D.P.R. 420. Aunque técnicamente los anteriores dueños, los interesados, y el fiscal no sean partes, en el sentido clásico de la palabra, sin embargo ellos siempre tendrían la oportunidad, al comparecer, de solicitar el traslado a la sala más apropiada. Si ellos no comparecen o, si compareciendo ellos no solicitan tal traslado, debe entenderse que ha mediado el "convenio" a que se refiere la sección 10 de la Ley de la Judicatura, pudiendo ser dicho convenio expreso o implícito. En esa forma quedan salvaguardados los derechos de todos los interesados en el

procedimiento. Además, la propia sección 10 continúa disponiendo que "de no ser así oído, será transferido por orden del juez a la sección o sala correspondiente, de conformidad con las reglas que el Tribunal Supremo adoptare". La facultad de transferencia que tiene el juez "motu proprio" es aplicable a procedimientos *ex parte* y la existencia en sí de tal facultad implica que la cuestión no es una de jurisdicción fatal e inexorable, que conlleve, aún al no ejercitarse tal facultad, la invalidez absoluta de la resolución.

Desde el punto de vista realista y funcional, es más conveniente el que los expedientes de dominio se tramiten en la sala que esté más cercana al sitio donde estén localizados los bienes, a los fines de que los colindantes y demás interesados, generalmente vecinos de ese sitio, tengan una oportunidad más adecuada para comparecer y hacer valer sus derechos. Pero se trata ya de una regla de conveniencia, esto es, de lugar del juicio (*venue*), y no de jurisdicción, cuya ausencia sea implacablemente fatal. Estando colocada la situación en una categoría de conveniencia procesal, y no de metafísica jurisdiccional, el juez que presida la sala más lejana, donde se haya radicado la petición, siempre tendría la facultad de ejercitar su discreción, en bien de la justicia y de los derechos potenciales de los interesados, al efecto de trasladar, motu proprio, el procedimiento a la sala más cercana, y ésa debería ser la práctica aconsejable. Pero su omisión de así hacerlo, aunque podría producir inconveniencia práctica, no produciría invalidez técnica. Además, si comparece el titular de un asiento contradictorio de dominio y se opone a las pretensiones del peticionario, el expediente tiene que convertirse en un juicio contencioso y plenario antes de que se pueda cancelar el asiento contradictorio. *Bermúdez* v. *Registrador*, 74 D.P.R. 151; *Benítez* v. *Registrador*, supra; *Bravo* v. *Registrador*, 71 D.P.R. 921; *Mercado* v. *Registrador*, 68 D.P.R. 138; *Rodríguez* v. *Registrador*, 65 D.P.R. 653. Tal beneficiario de un derecho inscrito contra-

dictorio siempre podría solicitar el traslado correspondiente y, de todos modos, ya el procedimiento sería contencioso, y no *ex parte*.

Aun de no solicitarse el traslado, mientras sea *ex parte* el procedimiento, el hecho en sí de que la resolución haya sido dictada por una sala inconveniente no tiene ribetes de tragedia judicial, ni destruye definitivamente los derechos de los interesados. Un expediente de dominio no es una declaración definitiva de derechos y, por lo tanto, no impide un juicio declarativo posterior a instancias de los interesados. Morell, ob. cit., pág. 529. El expediente tiene el exclusivo efecto de habilitar de título (posesorio) o de dominio al que no lo tenga, o sea, de justificar la existencia de un título de dominio, sin que, por lo tanto, equivalga a una declaración de derechos. Sentencia del Tribunal Supremo de España de 21 de marzo de 1910; Resolución de la Dirección General de Registros de 16 de noviembre de 1923; Roca Sastre, ob. cit., Tomo 2, pág. 485 *et seq.*, pág. 488. La resolución aprobatoria de un expediente de dominio no constituye cosa juzgada, y no impide un ataque posterior a la resolución por quienes no hayan litigado. *Benítez* v. *Registrador*, supra, a la pág. 568; *González* v. *El Pueblo*, 10 D.P.R. 483; Barrachina, Derecho Hipotecario y Notarial, Tomo 4, pág. 322. La inscripción de una resolución aprobatoria de un expediente de dominio no es óbice para que otra persona interponga una acción reivindicatoria. *Sucn. Meléndez* v. *Almodóvar*, 70 D.P.R. 527. De manera que, aun si el caso se ha visto *ex parte* en una sala inapropiada, los derechos esenciales de los interesados que no han comparecido no han quedado mutilados, y tales interesados aún tienen el resguardo de una acción plenaria posterior, en cuanto a sus derechos sustantivos.

La importancia de este caso justifica una consideración más amplia de algunos de sus aspectos. La sección 10 ya transcrita de la Ley de la Judicatura, contiene, en parte, las siguientes disposiciones:

(1) El Tribunal de Primera Instancia es *un tribunal* con autoridad para actuar *en todo procedimiento*.

(2) Toda acción civil o criminal se presentará en aquella sala del tribunal situada en el territorio en que la misma hubiese sido radicada bajo la legislación en vigor hasta la aprobación de tal ley. Aparentemente ésta es una disposición mandatoria, pero ella queda calificada inmediatamente en la propia sección 10 por las siguientes disposiciones:

(3) No se desestimará ningún caso fundado en haberse sometido a una sección sin jurisdicción o autoridad o a una sala de un tribunal sin competencia para ello.

(4) Todo caso *podrá* ventilarse en la sección o sala en que se radique, *por convenio de las partes*, y la anuencia del juez.

Debemos recordar que lo que está envuelto en este caso es la actuación de un Registrador al denegar la inscripción de una resolución judicial. Se basó el Registrador en que el expediente no fué tramitado en el partido donde radican los bienes, de acuerdo con lo dispuesto en el artículo 395 de la Ley Hipotecaria. Pero ya hemos visto que uno de los efectos de la reforma judicial ha sido el de crear un solo partido, el de Puerto Rico. Por lo tanto, el expediente de dominio fué tramitado en el partido donde radican los bienes, y se desvanece, por lo tanto, el fundamento de la actuación del Registrador. Pero asumiendo la facultad de un Registrador de denegar la inscripción de una resolución judicial porque no se hayan cumplido con los requisitos de ley que sean condiciones precedentes para poder dictar la resolución, o que no hayan observado los trámites y preceptos esenciales para su validez (*Nido & Cía. S. en C.*, v. *Registrador*, 74 D.P.R. 789, 801, nota (2), y casos allí citados), tendríamos que comprobar si se han cumplido los trámites esenciales establecidos en la sección 10 de la Ley de la Judicatura.

Es cierto que dicha sección determina que toda acción se presentará en aquella sala en que la acción hubiese sido radicada bajo la legislación anteriormente en vigor. Bajo la legislación en vigor antes de la reforma judicial, el expediente

de dominio en este caso se hubiese visto en la hoy Sala de Guayama. Pero la sección 10 sigue disponiendo que *todo caso* podrá ventilarse en una sala distinta a la señalada por las leyes anteriormente en vigor, por convenio de las partes y la anuencia del juez. Se hace preciso determinar si hubo "convenio de las partes". Es esencial el formular una definición del concepto de "convenio". El término puede tener varios significados, y la selección que hagamos de una de esas connotaciones tiene que fundamentarse en un criterio razonable en cuanto a cuál fué la intención legislativa al utilizar ese concepto. El comprobar esa intención del legislador requiere una cabal investigación de cuál fué el propósito legislativo al aprobar la totalidad de la Ley de la Judicatura, en el ámbito de nuestra Constitución, que era complementada por la ley en cuestión, y en vista de la historia legislativa anterior en cuanto a las reglas referentes al lugar del juicio.

La palabra "convenio" en su significación general, podría identificarse como un contrato expreso y escrito entre dos o más personas, que dé lugar a una obligación. Ese podría ser su alcance en el derecho positivo, bajo las disposiciones del Código Civil. (Enciclopedia Jurídica Española, Tomo 9, pág. 466.) Pero, en cuanto a los requisitos procesales referentes al lugar del juicio (*venue*), la connotación de "contrato por escrito" es aplicable solamente a un pacto formal hecho por las partes antes de iniciarse cualquier contienda judicial, en que se conviene previamente en concederle competencia a determinado tribunal. Un "convenio" puede ser expreso o implícito. Puede significar la unión de voluntades para crear contractualmente derechos y obligaciones pero, al decirse que dos personas convienen *en* una cosa, ello puede implicar que ambas están de acuerdo, aunque no entre sí, con determinada proposición, o sea, que cada una de ellas, separadamente, conviene, está de acuerdo con la misma cosa, sin que haya mediado un convenio bilateral *entre* ambos. El Diccionario de la Real Academia Española, define, en parte, la palabra "convenir" como el "coincidir dos o más voluntades causando obligación",

pero también establece otra modalidad, cual es la de "ser de un mismo parecer o dictamen". Esta última es, a nuestro juicio, la verdadera significación del concepto usado en la sección 10, al disponer que todo caso podrá ventilarse en la sala en que se radique, por convenio *de* las partes (no se dice "convenio entre las partes"), esto es, cuando cada una de las partes, separadamente, conviene, está de acuerdo, está conforme, con que el caso se siga ventilando en esa sala, manifestándose esa conformidad, individual y separada, ya sea expresamente, o tácitamente a través de su conducta o inacción al no oponerse, teniendo oportunidad para ello, a que el caso se siga tramitando en esa sala.

La sección 10, en su texto inglés, al referirse al convenio, utiliza las palabras "agreement of the parties". Tal como se indica en Webster's New World Dictionary, "agreement" significa: "a contract . . . arrangement or understanding between two or more persons . . . *being in harmony and accord*". Cuando ambas partes en un litigio convienen en determinada sala, ello puede implicar que ambas separadamente, están en armonía y de acuerdo con el mismo propósito.

El Juez Charles E. Clark, quien tomó parte destacada en la redacción del ante-proyecto que culminó en la Ley de la Judicatura, identifica el término de "convenio" con el de "consentimiento", esto es, que cada una de las partes consiente en que el caso se vea en determinada sala. 61 Yale L. J. 1147, 1157.

Los precedentes legislativos en Puerto Rico sostienen nuestra tesis al efecto de que al referirse la sección 10 a "convenio de las partes", ello no implicaba, exclusivamente, un contrato escrito bilateral. Los artículos 75, 76 y 77 de nuestro Código de Enjuiciamiento Civil, disponen lo siguiente:

"Artículo 75.—Deberán sustanciarse en .el distrito en que radique el objeto de la acción, o parte del mismo, sin perjuicio de la facultad de la corte para cambiar el lugar de la vista, a tenor de lo dispuesto en este Código, los pleitos que se sigan por las causas siguientes:

"1. Para recobrar la posesión de bienes raíces o de una propiedad o interés en la misma, o para determinar en cualquier forma dicho derecho o interés, y por daños causados a propiedad inmueble.

"2. Para la partición de propiedad inmueble.

"3. Para la ejecución de una hipoteca sobre la propiedad inmueble. Si la propiedad estuviese radicada parte en un distrito, y parte en otro, el demandante podrá elegir cualquiera de los dos, y el distrito así elegido será el propio para la vista de dicho asunto.

"Artículo 76.—Con arreglo a su jurisdicción, una corte conocerá de los pleitos a que dé origen el ejercicio de las acciones de todas clases, cuando las partes hubieren convenido en someter dicho pleito a la decisión de tal corte.

"Artículo 77.—Se entenderá hecha la sumisión:

"1. Por convenio escrito de las partes.

"2. Por el demandante, en el mero hecho de acudir a la corte interponiendo la demanda.

"3. Por el demandado en el hecho de hacer, después de personado en los autos, cualquiera gestión que no sea la de pedir, que el juicio se celebre en la corte correspondiente o, que se suspenda o levante el embargo que se hubiere decretado; *Disponiéndose,* que cuando se dictare orden por una corte sobre embargo de bienes de un demandado residente en otro distrito, éste podrá hacer suspender o levantar dicho embargo, mediante pago, consignación o afianzamiento de las sumas reclamadas, que verificará al márshal que practique el embargo; *Disponiéndose, además,* que dicho márshal tendrá poder y autoridad para admitir y aprobar la fianza que se le presente con dos o más fiadores abonados."

Podemos observar que bajo el artículo 76, cualquier corte podía conocer de cualquier pleito cuando las partes hubieren *convenido* en someter dicho pleito a la decisión de tal corte. El artículo 77 define el alcance de la frase "cuando las partes hubieren convenido" al indicar que se entenderá hecha tal sumisión bajo ciertas circunstancias. El "convenio" se identifica con la "sumisión", y, bajo el artículo 77 se entendía hecha la sumisión, esto es, el convenio en su connotación general, (*a*) por convenio escrito de las partes; (*b*) por el demandante, al radicar la demanda y (*c*) por el demandado al

personarse en los autos y no solicitar el traslado. Surge de esos artículos que el convenio escrito de las partes era solamente una modalidad de la sumisión, esto es, del convenio de las partes a que se refiere, en general, el artículo 76. Al hablarse en ese artículo del convenio de las partes, ello no estaba limitado al primer inciso del artículo 77, esto es, al convenio por escrito, sino que ello se extendía a las otras categorías comprendidas en el artículo 77, esto es, a la sumisión tácita.

Ahora bien, los artículos 76 y 77 transcritos fueron adoptados del Código de Enjuiciamiento Civil de España. Tanto en España como en Puerto Rico, se ha entendido siempre que el "convenio escrito de las partes" mencionado en el inciso 1 del artículo 77, se refería a un pacto formal en cuanto al lugar del juicio, otorgado antes de que se inicie un pleito. *Gómez v. Toro*, 23 D.P.R. 642; *Banco de Ponce v. Iriarte*, 60 D.P.R. 72. Y también se ha resuelto en repetidas ocasiones que al decir el artículo 76 "cuando las partes hubieren convenido en someter dicho pleito a la decisión" de determinada corte, tal convenio incluye y es aplicable a la sumisión tácita de las partes, esto es, al convenio tácito de las partes, evidenciado por su conducta o inacción al no solicitar el traslado. Enciclopedia Jurídica Española, Tomo 29, pág. 261; *Jiménez v. Corte*, 45 D.P.R. 921; *Carbonell v. El Reg. de la Propiedad*, 17 D.P.R. 148; *Porto Rican Leaf Tobacco Co. v. Ereño*, 16 D.P.R. 100; *Arsuaga v. Registrador*, 46 D.P.R. 296.

Ya hemos visto que fué, en parte, el propósito de la reforma judicial encarnada en la Constitución y en la Ley de la Judicatura, el eliminar los defectos jurisdiccionales, el destruir los efectos inexorablemente fatales de una equivocación en cuanto a la identidad del foro judicial o del tribunal en donde ha de ventilarse un caso, de imprimirle movilidad a los asuntos judiciales, y el de colocar el concepto de jurisdicción en la categoría de los postulados referentes al lugar del juicio o "venue". No pudo haber sido la intención legislativa, al aprobar la sección 10, el restringir los conceptos de "convenio"

y "sumisión" a una sola de las categorías del artículo 77, esto es, al contrato por escrito. No pudo haber sido la intención el eliminar el concepto de "sumisión tácita". Una interpretación restrictiva del término "convenio de las partes" sería contraria a los propósito esenciales de la reforma judicial.

Ahora bien, es de notarse que el artículo 77 dispone que se entenderá hecha la sumisión tácita, en cuanto al demandante, al radicar éste su demanda y, en cuanto al demandado, al personarse en los autos sin solicitar el traslado. Surge el problema de si, al no comparecer un demandado en forma alguna, esto es, al estar en rebeldía, ello implica una sumisión tácita, esto es, si el concepto de convenio es aplicable a una parte en rebeldía. En el caso de autos, las personas citadas no comparecieron y no formularon objeción alguna. El Fiscal compareció e informó que no tenía objeción. De todos modos, interpretando el artículo 58 del Código de Enjuiciamiento Civil de España, que corresponde al 77 nuestro, el Tribunal Supremo de España ha resuelto que la rebeldía de un demandado no puede estimarse como sumisión tácita (Sentencias del 20 de diciembre de 1886 y 3 de noviembre de 1896), basándose el Tribunal de España en el criterio de que tal artículo exige que el demandado se haya personado en autos. Desde el punto de vista de la lógica jurídica, la doctrina española no merece nuestra aprobación. Tratándose de una sumisión tácita por inacción de un demandado, esto es, por no solicitar el traslado teniendo una oportunidad para ello, equivaliendo tal pasividad a una renuncia del privilegio de solicitar el traslado, la aceptación implícita de determinado tribunal o foro surge, no sólo de comparecer y no solicitar el cambio del lugar del juicio sino que también de ser citado, tener conocimiento de que hay un caso pendiente en ese tribunal y, sin embargo, no comparecer en absoluto y aceptar en silencio la competencia de ese tribunal. Tanta aceptación implícita hay en un caso como en el otro. Tanta manifestación de conformidad, de convenir o consentir, hay en el caso

de comparecer y no solicitar, como en el de no comparecer en absoluto. Desde un punto de vista técnico, el artículo 77 dispone que *se entenderá* hecha la sumisión cuando el demandado se persona en autos y no solicita el traslado. Pero el entender que ciertas modalidades están incluídas en una categoría general no excluye la posibilidad de la inclusión de otras modalidades. El caso de rebeldía no queda excluído por el artículo 77, especialmente al colocarnos en el campo del acuerdo tácito. De todos modos, en vista del amplio propósito de subsanación de defectos de la sección 10 de la Ley de la Judicatura, la incomparecencia de una parte en un caso ante una sala inapropiada, no debe producir la desestimación de la acción, y debe ser considerada como el convenio o conformidad de esa parte.

▮ La sección 10 habla del convenio *de las partes*. Se podría alegar que tal disposición es aplicable a casos contenciosos, en que hay partes en litigio. Pero debe ser aplicable a casos contenciosos y a aquéllos que puedan convertirse en contenciosos. El expediente de dominio, como ya hemos visto, puede convertirse en contencioso, especialmente si los titulares de asientos contradictorios en el Registro comparecen a hacer valer sus derechos. Ellos tienen la oportunidad de convertirse en partes y solicitar el traslado, sí así lo desean. Si no lo solicitan, ellos han convenido en que el procedimiento se siga tramitando en determinada sala. En el caso de autos, fueron citados el Fiscal, un anterior dueño y los causahabientes de otro anterior dueño, y por edictos, todas las personas cuyos derechos pudiesen quedar afectados. Todos ellos podían haber comparecido, y no lo hicieron, con excepción del Fiscal, que manifestó expresamente que no tenía objeción alguna.

En vista de lo anteriormente expuesto, la resolución aprobatoria del expediente de dominio en este caso, dictada por la Sala de Caguas del Tribunal Superior, no es nula y actuó erróneamente el Registrador de la Propiedad al denegar la inscripción de tal resolución.

*Debe revocarse la nota recurrida y ordenarse la inscripción de la resolución aprobatoria del expediente de dominio.*
El Juez Asociado Sr. Negrón Fernández disintió.

Opinión disidente emitida por el JUEZ ASOCIADO SEÑOR SIFRE.

En la opinión de la mayoría no se resuelve que la Ley de la Judicatura derogó el precepto del artículo 395 de la Ley Hipotecaria que dispone que los expedientes de dominio se tramitarán presentándose un escrito "al Juez de primera instancia del partido en que radiquen los bienes". Por el contrario, se hace un esfuerzo para reconciliarlo y armonizarlo con las disposiciones de la Ley de la Judicatura, diciéndose que "existe un solo 'partido' que comprende la totalidad de Puerto Rico y si los bienes están situados en ese único 'partido' . . . cualquier Sala del Tribunal de Primera Instancia podría considerar un expediente de dominio en forma compatible" con la Ley Hipotecaria. No me explico cómo es posible llegar a esa conclusión sin considerar derogado el citado precepto del artículo 395, supra. Una de dos, o ha quedado derogado, o está en vigor. Si lo está, y ese es mi criterio, la interpretación que le dá el Tribunal con el fin de hacerlo compatible con la Ley de la Judicatura, destruye el objeto y propósito del mismo, y es a mi entender errónea.

Soy de opinión que las disposiciones de la sección 10 de la Ley de la Judicatura que tratan, entre otras cosas, del lugar en que podrán presentarse y ventilarse las acciones civiles o criminales, no son de aplicación por sus términos a los expedientes de dominio. Estoy convencido que no tuvo el legislador la intención de que lo fueran. Tales expedientes deberán tramitarse con sujeción a lo preceptuado en el artículo 295 de la Ley Hipotecaria, y la competencia del juez para conocer de los mismos ha de determinarse por la situación de los bienes, sin que pueda invocarse el principio de la sumisión reconocido por la sección 10, supra, para otros asuntos.

Aunque de acuerdo con la Ley de la Judicatura, existe un solo distrito judicial, el Tribunal Superior tiene, sin embargo, salas en San Juan, Bayamón, Arecibo, Aguadilla, Mayagüez, Ponce, Guayama, Humacao y Caguas. El propósito que persigue el artículo 395, supra, se logra, y se cumple con sus preceptos, presentándose los expedientes de dominio en la sala del Tribunal Superior del territorio en que estén situados los bienes, sin que ello conflija con el hecho de existir un solo distrito judicial.

La nota del Registrador recurrido debería ser confirmada.

---

Opinión disidente emitida por el JUEZ ASOCIADO SEÑOR BELAVAL.

Este recurso plantea en el fondo un problema mucho más serio que el que muestra su superficie. Estamos frente a un caso, donde por primera vez, tendremos que fijar el efecto de la reforma judicial del 1952 sobre las estructuras históricas de nuestro derecho hipotecario. El señor Registrador de la Propiedad de Guayama denegó la inscripción de una resolución declarativa de dominio, dictada por el ilustrado Juez del Tribunal Superior de la Sala de Caguas, sobre una finca rústica situada en el Barrio Quebradillas de Barranquitas, por el fundamento de estar dicha finca ubicada en un partido territorial distinto a aquél en que se tramitó el expediente de dominio. El Registrador recurrido se ampara en el artículo 395 de nuestra Ley Hipotecaria, que dispone, que un expediente de dominio se tramitará *ante el juez de primera instancia del partido en que radiquen los bienes.* La conveniencia práctica que hay detrás del artículo 395 es evidente: darle una oportunidad a los opositores en título a acudir al juzgado más cercano para oponerse a la pretensión del peticionario, haciendo a su vez más factible el principio cardinal de publicidad que inspira nuestra legislación hipotecaria. Es indudable que si el expediente se tramita en el juzgado más cercano al sitio donde ubica la finca rústica, los opositores en derecho tienen una mejor oportunidad para hacer valer sus

derechos, sobre todo, cuando se trata de pequeños terratenientes que generalmente cuentan con pocos recursos para su defensa.

Estamos conformes en principio con la afirmación, que la disposición final de la sección 10 del artículo III de la Ley número 11 de 24 de julio de 1952, conocida como Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, que dice:

"Todo caso podrá ventilarse en la sección o sala en que se radique, por convenio de las partes y la anuencia del juez que presida dicha sala en ese momento, o, de no ser así oído, será transferido por orden del juez a la sección o sala correspondiente, de conformidad con las reglas que el Tribunal Supremo adoptare,"

parece estar en conflicto con las disposiciones iniciales del artículo 395 de nuestra Ley Hipotecaria, que dice:

"Todo propietario que careciere de título escrito de dominio, cualquiera que sea la época en que hubiese tenido lugar la adquisición, podrá inscribir dicho dominio, justificándola con las formalidades siguientes:

1. Presentará un escrito *al Juez de primera instancia del partido en que radiquen los bienes,* o al del en que esté la parte principal, si fuese una finca enclavada en varios partidos, refiriendo el modo con que los haya adquirido, y las pruebas legales que de esta adquisición pueda ofrecer, y pidiendo que, *con citación de aquel de quien procedan dichos bienes,* o de su causahabiente y del Ministerio fiscal, se le admitan las referidas pruebas y se declare su derecho."

Para concluir sobre la inevitabilidad de dicho conflicto, no tendremos más remedio que estudiar a fondo la reforma que sufre la judicatura de Puerto Rico desde el 1950 hasta el presente.

Hasta el 1950, las estructuras del poder judicial sobre las cuales tenía autoridad nuestra Asamblea Legislativa, eran las siguientes: (1) un juzgado de paz, especie de comisaría urbana que entendía originalmente en infracciones de ordenanzas municipales e intervenía en la investigación de delitos

menos graves, cada uno con una demarcación territorial fijada por ley, dentro del perímetro de una ciudad; (2) una corte municipal, especie de corte de litigios ordinarios, que entendía originalmente en acciones personales hasta quinientos dólares y en denuncias criminales por delitos menos graves, e intervenía en la investigación de delitos graves, cada una con una demarcación territorial fijada por ley, dentro del perímetro de un municipio o más de un municipio, siguiendo la organización política correspondiente al Gobierno Municipal, y (3) una corte de distrito, verdadero tribunal de primera instancia, en el sentido clásico de la palabra, que entendía originalmente en acciones personales sobre quinientos dólares y en delitos graves mediante acusación por un promotor fiscal, o en algunos delitos menos grave, pero de gran importancia pública, mediante denuncia por un promotor fiscal, en acciones reales, procedimientos legales especiales, recursos extraordinarios, relaciones de familia y revisión de algunas decisiones administrativas, cada una con una demarcación territorial fijada por ley, dentro del perímetro de un distrito, siguiendo la organización política correspondiente al distrito para fines electorales; (4) un tribunal de última instancia, con jurisdicción apelativa sobre todos los tribunales y algunos organismos administrativos de Puerto Rico, con facultad para ver en primera instancia algunos recursos extraordinarios, celebrar exámenes de révalida y disciplinar a los abogados admitidos.

Con un plan estructural tan simple, es natural que fueran pocos y exentos de toda complejidad procesal, los casos de conflicto en cuanto a jurisdicción y competencia. Durante cincuenta años, abogados de formación española, de formación norteamericana y de formación netamente puertorriqueña, colaboraron estrechamente para lograr la armonía entre la legislación procesal de tipo español—deslinde, consignación, retracto, expedientes de perpetuidad, expedientes de posesión o dominio, interdictos posesorios, testimonios por exposición, cancelación de cargas hipotecarias, ejecutivos hipo-

tecarios y la legislación procesal de tipo puertorriqueño, algunas veces tomadas de fuentes norteamericanas. Un análisis desapasionado de la jurisprudencia de los últimos veinticincc años demuestra, que esa mortificación característica de otras jurisdicciones relativa a determinar qué corte tiene jurisdicción o competencia, no era una mortificación puertorriqueña.

En el 1950, en virtud de la Ley número 432 de 15 de mayo de 1950 (Leyes de 1949–50, pág. 1127), las distintas sedes judiciales establecidas de acuerdo con sus respectivas demarcaciones territoriales fueron unificadas para los efectos de jurisdicción exclusivamente, aunque nunca se definió claramente, ni en la ley ni por la jurisprudencia, cuál era el alcance de dicha jurisdicción unificada. Las referencias posteriores en el debate que se desarrolla ante la Convención Constituyente, nos permiten concluir que el concepto "jurisdicción" era algo equivalente a "jurisdicción territorial" y que estábamos frente a un problema de abolición de sedes territoriales exclusivamente. Los artículos 21 y 27 de la Ley número 432 determinaban que cualquiera sala del Tribunal Municipal o del Tribunal de Distrito podría conocer de cualesquiera acciones civiles o criminales comprendidas dentro de su jurisdicción (entiéndase competencia), a menos que se solicitara el traslado a la sala que tradicionalmente entendía en dichos asuntos.

La doctrina en cuanto a jurisdicción y competencia era tan diáfana, y la tradición de circunscribir la demarcación territorial de acuerdo con la organización política del país era tan fuerte, que dicha medida no tuvo ninguna repercusión en nuestra vida judicial. Nuestros propios archivos demuestran que sólo dos casos, ambos bastantes inocuos, tuvo que resolver este tribunal para fijar los alcances de la nueva ley. La práctica demostró, sin embargo, que la facilidad de radicar un caso fuera del distrito o del municipio donde solía verse, presentaba algunos problemas de funcionamiento poco deseables: por ejemplo, algunos embargos preventivos resultaban excesivos, porque los jueces de los otros distritos o municipios,

no podían apreciar justicieramente el valor de los bienes embargados como hubiera podido hacerlo un juez residente. Al momento de tomar medidas provisionales en recursos extraordinarios, la información del juez de otro distrito no era tan cabal como podía haber sido la del juez residente, para medir el balance de conveniencias. Cuando se desacataban los entredichos temporales, y para la vista del desacato se solicitaba el traslado, el juez residente algunas veces dejaba sin efecto la mostración de causa y anulaba la orden de entredicho provisional, por tener una concepción distinta del caso. Cuando el caso se veía fuera del municipio o distrito donde residía el deudor, por pura conveniencia de los abogados, los gastos incidentales a la vista del caso, resultaban demasiado opresivos para los litigantes de escasos recursos, y por lo tanto, se convertían en una ventaja para los litigantes de mayores recursos.

Cuando se reune nuestra Convención Constituyente en 1952, están circulando por la opinión pública tres objeciones principales sobre el funcionamiento de nuestra judicatura: (1) el retraso en el despacho de los asuntos judiciales; (2) la deseabilidad de separar la función judicial de toda ingerencia administrativa del ejecutivo y (3), la deseabilidad de diseñar un sistema administrativo que garantizara la independencia judicial. La reforma que intenta nuestra Constitución no podrá entenderse nunca, si tratamos de divorciarla del debate público que la precede, con la idea de analizar los postulados puramente teóricos de dicha reforma. Si una democracia significa antes que nada, circulación de ideas bajo criterios en conflicto, la Convención Constituyente se enfrentó con tres problemas, largamente debatidos en la opinión pública; (1) la acumulación de casos pendientes, especialmente en aquellas zonas donde la población había aumentado; (2) la falta de un organismo adecuado, funcionando dentro de la propia esfera judicial, para llevar a cabo una distribución más sistemática de la tarea judicial y (3) el establecimiento de los

máximos de garantía judicial necesarios para lograr una verdadera independencia judicial.

La solución del problema de acumulación de casos pendientes en aquellas zonas donde la población había aumentado, se había intentado anteriormente mediante la creación de nuevas salas en las cortes tradicionales y mediante la especialización de jueces, que pudieran disponer más fácilmente de asuntos similares sometidos a su especialidad. Sin embargo, desde 1950 se consideró, que unificando todo el sistema en sus aspectos puramente funcionales, podría obtenerse un mejor resultado, sin necesidad de incurrir en las erogaciones que indudablemente representaba la creación de nuevas salas. Para esto había que sacrificar el anterior sistema de permanencia de los jueces dentro de sus respectivas sedes territoriales, principio que había respetado la Ley número 432 de 15 de mayo de 1950. Sacrificar la permanencia de los jueces dentro de sus respectivas sedes, es un riesgo que va a la entraña misma de la independencia judicial. Poder mover un juez de su sitio, ha sido siempre una de las aspiraciones más conspicuas de abogados, litigantes y grupos de presión. Esta movilidad puede crear una judicatura débil como una hoja, que vaya dando vueltas al capricho de las pasiones humanas. Basta una simple insinuación de parcialidad, cosa frecuente en pleitos humanos, donde la pasión no respeta ni siquiera los símbolos de la sociabilidad, para que el juez tenga que descender de su estrado, por una simple orden administrativa, sin que el abogado tenga que explicar públicamente las razones por las cuales desconfía de la imparcialidad de un magistrado. Pero el ánimo funcionalista, tan característico de nuestro tiempo, se impuso sobre el escrúpulo tradicional contra las cortes realengas, "donde el villano sale siempre peor aderezado que el fijodalgo", como diría aquel clásico de cuyo nombre nunca sabremos acordarnos. Así es como se produce la Sección 2 del artículo V de nuestra Constitución.

La falta de un organismo adecuado, funcionando dentro de la propia esfera judicial, para llevar a cabo una distribu-

ción más sistemática de la tarea judicial, trajo como solución, poner todo el sistema judicial en manos del Juez Presidente del Tribunal Supremo de Puerto Rico. Así es como se produce la Sección 7 del Artículo V de nuestra Constitución.

En cuanto a los máximos de garantía judicial compatibles con un sistema democrático, la Constitución se encargó de proveer medidas directas, tales como, prohibición de eliminar jueces mediante la reorganización de tribunales, prohibición de acortar los términos de su nombramiento, prohibición de disminuir los sueldos de los jueces durante el término para el cual fueron nombrados. Cada una de estas medidas fué objeto de un debate público prolongado, especialmente la primera disposición que le sirve de clave a las otras dos: prohibición de eliminar jueces mediante la reorganización de tribunales. Así es como se producen las Secciones 8, 10 y 13 del Artículo V y Sección 11 del Artículo VI de nuestra Constitución.

La Comisión de la Rama Judicial de la Convención Constituyente de Puerto Rico, al informar sobre el alcance de lo que se denomina "sistema integrado", fija como objetivos de la reforma, los siguientes:

1. una mayor eficiencia en el ejercicio del poder judicial;
2. una distribución equitativa del trabajo de las cortes, que permita la mayor rapidez en los procedimientos judiciales, evitando la congestión de causas pendientes en los tribunales;
3. énfasis en el principio de especialización de jueces en lugar de especialización de tribunales, evitándose así la necesidad de tribunales o salas adicionales o de crear un número excesivo de plazas de jueces;
4. reducción del costo por caso al erario público;
5. la mayor flexibilidad en la administración de justicia.

Para logar estos objetivos, la Comisión recomienda una medida que "establece la *completa unificación de los tribunales de Puerto Rico*. La unificación de los tribunales produce, entre otros efectos, *la eliminación de problemas técnicos de jurisdicción.* El poder legislativo queda, no obstante, *facul-*

*tado para determinar la competencia de los tribunales* y para disponer *que de acudir un litigante a un tribunal distinto al indicado por las leyes sobre competencia, la parte contraria puede solicitar y obtener el traslado de la causa, o el tribunal motu proprio puede así disponerlo.* La Asamblea Legislativa queda asimismo facultada para autorizar la revisión judicial de resoluciones sobre traslados."

En cuanto al alcance jurídico del sistema integrado, como algo que pudiéramos considerar distinto al funcionamiento puramente mecánico de la reforma, el informe de la Comisión de la Rama Judicial de la Convención Constituyente, dice lo siguiente: "Este sistema judicial integrado que recomendamos eliminará en los litigios *las cuestiones técnicas de jurisdicción.* Dentro del sistema que hasta ahora ha prevalecido en Puerto Rico, *a menudo* se derrotaban los fines de la justicia y se perjudicaban irremediablemente los derechos de litigantes por haber éstos acudido a tribunales que según dicho sistema carecían *por razones sumamente técnicas*, de jurisdicción para conocer en su causa. *Frecuentemente* se descubría el error técnico, cuando ya el litigante había incurrido en gastos y pérdida de tiempo. El establecimiento de este sistema judicial unificado que se recomienda eliminará de manera absoluta todas estas deficiencias. *Por otro lado, se reserva al Poder Legislativo la facultad de disponer por ley sobre la competencia de los tribunales, incluyendo el lugar donde deben ventilarse los litigios.* Un error por razón de competencia podrá siempre ser subsanado a petición de las partes o por disposición del tribunal, sin que se perjudiquen fatalmente los derechos de los litigantes."

La frecuencia en los errores técnicos de jurisdicción, que parece ser uno de los postulados teóricos de la reforma, es tan extraña a la práctica de nuestra profesión en Puerto Rico que no podemos menos que sonreír cuantas veces la vemos aparecer en el debate. Cualquier Auxiliar de Jurisprudencia de este tribunal podría demostrar que el caso que falla por una cuestión técnica de jurisdicción, es tan poco frecuente, tan

aislado, tan inconexo con nuestro cuerpo de principios doctrinales, que no ha debido nunca ser una fuerte preocupación para nuestros reformistas. Parece que la experiencia inglesa, con toda su artificiosa nomenclatura de cortes instituídas sobre privilegios forales y la experiencia norteamericana con todos sus conflictos inherentes a su composición federativa, se tomaron como un modelo de lo que podría ser el caso puertorriqueño, y no se consideró para nada nuestra propia realidad. Pero siempre resulta una mejor actitud para enfrentarse con una reforma prescindir de los elementos de juicio puramente personales, y buscar en la extrema objetividad, el método preciso.

Partiendo tanto de la línea de pensamiento que busca un funcionamiento adecuado para una mejor distribución de la tarea judicial, como de la línea de pensamiento que procura la eliminación de las cuestiones técnicas de jurisdicción, es indudable que el concepto "jurisdicción" se entiende como algo distinto a "competencia y como algo diferente al *lugar donde deben ventilarse los litigios*", o sea, el concepto jurisdicción se toma en su acepción genérica, como aquella potestad conferida por ley a cada tribunal para actuar.

Estamos conformes con la proposición universalmente sostenida por los tratadistas más confiables, que la teoría general sobre jurisdicción, comprende, no solamente la *jurisdicción* propiamente dicha, o sea, la facultad expresamente delegada por el poder soberano a determinado tribunal, en virtud de un mandato de ley, para pasar sobre los derechos de las personas o las cosas en cualesquiera conflictos que puedan producirse entre las personas o referentes a las cosas sujetas al poder del soberano, sino también la *jurisdicción sobre la materia*, o sea, la competencia para entender sobre ciertas cuestiones litigiosas de acuerdo con su relativo valor para la sociedad o para la economía, y la jurisdicción territorial, o sea, la designación del área judicial (*venue*), donde debe ejercitarse el poder delegado para entender sobre ciertas materias. Pero no es menos cierto que la terminología jurídica, ha ido

distinguiendo a través del tiempo, cada especialidad como algo con derecho a vida propia dentro del género. De manera pues, que los tres conceptos claves pueden también, significar lo siguiente:

(1) jurisdicción, potestad para actuar sobre las personas o las cosas;

(2) competencia, facultad para entender sobre ciertas materias con exclusión de otros organismos judiciales creados para otros fines; y

(3) lugar del juicio, designación del área judicial donde se puede actuar a nombre del soberano y se puede entender sobre ciertas materias. Esta divisibilidad es la que explica el contrasentido que en otra forma se desprendería del propio texto del informe: que mientras por un lado, unifica la jurisdicción para fines funcionales, por el otro se mantiene la facultad de la Asamblea Legislativa de Puerto Rico para determinar la competencia y la organización de nuestros tribunales.

La tesis central del informe de la Comisión de la Rama Judicial de la Convención Constituyente, no se desvirtúa en el debate parlamentario que se desarrolla mientras se discute su aprobación por la Convención en pleno. La referencia más directa la hace el Presidente de la Comisión de la Rama Judicial señor Ernesto Ramos Antonini: "La independencia del Poder Judicial se garantiza, a nuestro juicio, según la proposición, mediante alrededor de diez características que contiene el proyecto . . . . una es la ya mencionada de la integración. Actualmente el sistema de organización de cortes, tal como rige actualmente y especialmente en lo relativo a las cortes municipales, y hasta cierto grado, a las cortes de distrito, funciona en gran parte como células, más bien que como células, como órganos separados o independientes. *No es una sola organización.* Consideramos que el sistema vigente se presta más a que las cortes funcionen un poco más desintegradamente de un poder judicial central, que deba dar la tónica de la función del poder judicial en nuestra sociedad."

Este ideal de la sola organización, de la mayor eficiencia, de la distribución equitativa, del énfasis en el principio de especialización de jueces, de la reducción en el costo por caso, de la mayor flexibilidad administrativa según los objetivos formulados por la Comisión de la Rama Judicial de la Convención, se concreta más en torno a un *funcionamiento unificado*, que en torno a la abolición total y absoluta del problema jurídico de la jurisdicción. Por lo menos, podemos afirmar con bastante seguridad, que en cuanto a la Convención Constituyente de Puerto Rico se refiere, *no hubo ninguna intención de unificar a los tribunales en todo lo relacionado a su competencia*. Por lo tanto, la jurisdicción unificada debe entenderse siempre en todo lo relacionado con la adopción de nuestra Constitución, como algo que no comprende la competencia, o sea, la jurisdicción sobre la materia propiamente dicha. Esto es lo que explica el texto de nuestra Constitución:

"Los tribunales de Puerto Rico constituirán un sistema judicial unificado en lo concerniente a jurisdicción, funcionamiento y administración. La Asamblea Legislativa en cuanto no resulte incompatible con esta Constitución, podrá crear y suprimir tribunales, con excepción del Tribunal Supremo, *y determinará su competencia y organización.*" (Sección 2 del Artículo V de nuestra Constitución.)

Como a la Asamblea Legislativa de Puerto Rico se le reserva la facultad de determinar la competencia y organización de los tribunales de Puerto Rico, debemos examinar la Ley número 11 de 24 de julio de 1952 ( (2) pág. 31), conocida como "Ley de la Judicatura del Estado Libre Asociado de Puerto Rico", para ver, si haciendo uso de la autoridad concedídale por la Constitución, la Asamblea Legislativa de Puerto Rico procedió a unificar la competencia y la organización de todos los tribunales de Puerto Rico.

Como se trata de una ley preparada por un cuerpo técnico para someterla a una legislatura, y no de una de esas leyes que se producen espontáneamente dentro de una legislatura,

es indudable que de poco o casi nada, nos servirá indagar cuál fué la verdadera intención legislativa en este caso. Tal vez el método adecuado para estudiarla sea, ver hasta qué punto, el plan teorético propuesto por el cuerpo técnico, es aplicable a nuestro medio judicial y cualquiera deficiencia someterla como un problema a nuestro poder de reglamentación.

El plan teorético propuesto por el cuerpo técnico, parece partir de la base, que la jurisdicción unificada significa *una abolición de todas las categorías judiciales*, y que por lo tanto, en cuanto a los jueces se refiere, cualquier juez del Tribunal Superior puede sentarse en una sala del Tribunal de Distrito, y viceversa, cualquier juez del Tribunal de Distrito puede sentarse en una sala del Tribunal Superior, no empece la diferencia en nombramiento, experiencia profesional, término de duración y sueldo que hay entre uno y otro. Esto es lo que se desprende de las secciones 3, 12 y 17 de la Ley. El plan teorético parece partir de la base así mismo, que la jurisdicción unificada significa *una abolición de todas las competencias judiciales*, y que por lo tanto, en cuanto a materias se refiere, cualquiera sala del Tribunal de Distrito puede ver casos pertenecientes a la sección del Tribunal Superior y viceversa, cualquiera Sala del Tribunal Superior puede ver casos pertenecientes a la sección del Tribunal de Distrito, no empece la diferencia en cuanto a organización, competencia y *trámite apelativo distinto*, establecido en la propia ley. Esto es lo que parece desprenderse de la sección 10 de la Ley. Veamos.

La sección 9 del artículo III de la Ley de la Judicatura del Estado Libre Asociado de Puerto Rico, que es la que organiza el Tribunal de Primera Instancia, dice así:

"El Tribunal de Primera Instancia *se compondrá de dos secciones,* una que se conocerá como Tribunal Superior y otra que se conocerá como Tribunal de Distrito. Cada sección será un tribunal de récord y estará constituída y desempeñará las funciones que más adelante se indican."

La sección 10, que es la que define qué jurisdicción y qué competencia concedidas por la legislación anterior, conserva el Tribunal de Primera Instancia, dice así:

"El Tribunal de Primera Instancia es un tribunal de jurisdicción original general, con autoridad para actuar a nombre y por la autoridad del Estado Libre Asociado de Puerto Rico, en todo procedimiento civil o criminal, según más adelante se dispone. *Toda acción civil o criminal se presentará en aquella sala del Tribunal situada en el territorio en que la misma hubiese sido radicada bajo la legislación en vigor hasta el presente,* pero no se desestimará ningún caso fundado en haberse sometido a una sección sin jurisdicción o autoridad o a una sala de un tribunal sin competencia para ello. Todo caso podrá ventilarse en la sección o sala en que se radique, por convenio de las partes y la anuencia del juez que presida dicha sala en ese momento, o, de no ser así oído, será transferido por orden del juez a la sección o sala correspondiente, *de conformidad con las reglas que el Tribunal Supremo adoptare."*

La sección 13 que corresponde al artículo IV, fija la *competencia* del Tribunal Superior en la siguiente forma:

El Tribunal Superior conocerá de los siguientes asuntos:

(*a*) En lo civil:

1. De toda apelación y recurso de revisión contra decisiones, órdenes y resoluciones de agencias administrativas, de acuerdo con los términos y condiciones establecidos por ley, excepción hecha de aquéllos de los cuales pueda conocer el Tribunal Supremo.

2. De todo caso, acción, procedimiento o recurso extraordinario relacionado con, o que afecte, la imposición, cobro y pago de toda clase de contribuciones incluyendo contribuciones sobre la propiedad, contribuciones sobre herencia y donaciones, contribuciones sobre ingresos, contribuciones sobre enriquecimiento injusto, contribuciones de seguro social, arbitrios, licencias y cualesquiera otras contribuciones o impuestos, así como de las reclamaciones de contribuciones cobradas por un procedimiento ilegal, o que voluntariamente o sin notificación del Secretario de Hacienda se hubieran pagado indebidamente o en exceso, cuyo reintegro esté autorizado por ley y haya sido rehusado por el Secretario de Hacienda.

3. De toda controversia relacionada con la valoración y justa compensación a ser pagada por bienes expropiados.

4. De todo recurso, acción y procedimiento, incluyendo testamentarías, divorcios, y recursos legales especiales y extraordinarios, en relación con los cuales el Tribunal de Distrito de Puerto Rico tenía jurisdicción para la fecha en que esta Ley entre en vigor.

5. De todo otro asunto civil en que la cuantía en controversia, reclamación legal o valor de la propiedad en disputa, exceda de dos mil quinientos dólares ($2,500), sin incluir intereses, costas y honorarios de abogado.

(*b*) En lo criminal:

1. De toda causa por delito grave.

2. De toda causa por delito menos grave, excepto aquéllas que envuelvan la infracción de estatutos y ordenanzas municipales, cuya ejecución hasta el presente había sido conferida exclusivamente al tribunal municipal o al de paz.

3. De todo caso del cual podía conocer anteriormente el Tribunal Tutelar de Menores, bajo los términos y condiciones que hasta el presente correspondían a dichos casos."

La sección 18 del artículo V determina la *competencia* del Tribunal de Distrito de la siguiente forma:

"El Tribunal de Distrito conocerá de los siguientes asuntos:

(*a*) En lo civil:

1. De todo asunto de que la corte municipal existente al tiempo de la vigencia de esta Ley podía conocer exclusiva o concurrentemente.

2. De todo otro asunto civil en que la cuantía en controversia, reclamación legal o valor de la propiedad en disputa, no exceda de dos mil quinientos (2,500) dólares, sin incluir intereses, costas y honorarios de abogado, *excepción hecha de aquellos asuntos especificados en la Sección 13(a), 2, 3 y 4 de esta Ley, de que puede conocer el Tribunal Superior.*

(*b*) En lo criminal:

1. De toda causa por delito menos grave, excepción hecha de aquéllas de que al presente la corte municipal no podía conocer.

2. De toda infracción de estatutos o de ordenanzas municipales, cuya ejecución había sido conferida exclusiva o concurrentemente a la corte municipal o a la de paz."

Un estudio minucioso de la sección 13 del artículo IV y de la sección 18 del artículo V, nos lleva de la mano a la conclusión imposible de evadir, que estamos frente a dos tribunales totalmente distintos el uno del otro, y que cualquier intento teórico de unificar ambos tribunales en uno solo, como se ha hecho en otros sitios, tropezaría con el inconveniente que la diversa organización de cada tribunal no permite la unidad que se pretende. La diversidad en competencia descansa fundamentalmente en la diversidad en organización. La diversidad en organización a su vez descansa en la diversidad en tramitación que impone las distintas materias comprendidas dentro de la competencia. El nuevo tribunal de distrito nunca podría normalmente ver un juicio por jurado, ni una acción de carácter real que necesitara intervención de un promotor fiscal, ni tendría probabilidad en tiempo y espacio para ciertas materias especializadas. Como cuestión de hecho, la sección 13 (c) establece claramente, que cuando por ley, la revisión de decisiones de las agencias administrativas o la institución de procedimientos haya sido asignada a la sección de San Juan del anterior Tribunal de Distrito, tales procedimientos en lo sucesivo se tramitarán en la Sala de San Juan del Tribunal Superior. Obsérvese que la sección 13 (c) se incluye bajo el subtítulo *"Lugar del juicio de ciertas causas."*

Un estudio comparativo de la sección 14 del artículo IV, que dice:

"Las sentencias finales y resoluciones del Tribunal Superior que hasta el presente podían ser apeladas del (anterior) Tribunal de Distrito, podrán ser apeladas al Tribunal Supremo de acuerdo *con los términos y condiciones establecidos por ley* y de conformidad con las reglas de procedimiento establecidas por el Tribunal Supremo, *excepción hecha* de que el derecho a apelar y el alcance de una apelación interpuesta *en casos instados bajo sección 13(c), 2, 3 y 4 de esta Ley,* serán los mismos que hasta el presente lo han sido y que ahora lo son en los casos instados bajo la sección 13 (a) 5",

y de la sección 19 del artículo V que dice:

"Por la presente se establece el derecho a apelar al Tribunal Superior de cualquier sentencia final del Tribunal de Distrito; *el procedimiento de apelación se seguirá a tenor con las reglas promulgadas por el Tribunal Supremo;* la vista y decisión de tales apelaciones tendrán lugar ante tres jueces del Tribunal Superior o ante uno solo de ellos, según por regla establezca el Tribunal Supremo, de conformidad con la naturaleza del caso o la cuantía envuelta o con cualquiera otra norma razonable a su discreción; y el Juez Presidente podrá asignar la vista de los casos bajo tal regla, cuando haya dudas o desacuerdo entre las partes; una ulterior revisión sólo podrá lograrse mediante certiorari ante el Tribunal Supremo, a ser librado por dicho tribunal a su discreción,"

demuestra que en cuanto a trámite apelativo se refiere, es claramente imposible que un caso comprendido dentro de la competencia de una de las secciones pueda verse en la otra, porque el sistema apelativo está diseñado en concordancia estricta con la distribución de competencias fijadas por ley, y tan pronto una parte intentara salirse de dicha distribución de competencias, quedaría afectado su derecho de apelación.

Entonces, ¿qué significa la última disposición de la sección 10 del artículo III, que dice:

"Todo caso podrá ventilarse en la *sección o sala en que se radique* por convenio de las partes y la anuencia del Juez que presida dicha sala en ese momento"?

En primer lugar, es claro que dicha disposición no puede interpretarse totalmente aislada de las otras disposiciones de la sección 10, y mucho menos del plan general de la reforma. La sección 10 empieza (1) por conceder al Tribunal de Primera Instancia, facultad para actuar a nombre del Estado Libre Asociado de Puerto Rico, en todo procedimiento civil ó criminal, *según más adelante se dispone,* o sea, el caso típico de la jurisdicción facultativa; (2) por disponer que toda acción civil y criminal se presentará en aquella sala del tribunal situada en el territorio en que la misma hubiese sido radicada,

bajo la legislación en vigor hasta el presente, o sea, el caso típico de la jurisdicción territorial; (3) por disponer que ninguna acción civil o criminal se desestimará por haberse sometido a una sección sin jurisdicción o autoridad, o a una sala sin competencia para ello, o sea una ampliación del derecho de traslado de causas, de una sección a otra, pues anteriormente, ni aún bajo la reforma del 1950, se podía trasladar una causa de una anterior corte municipal a una anterior corte de distrito y viceversa, y (4) termina autorizando que todo caso podrá ventilarse en la sección o sala en que se radique por convenio de las partes y la anuencia del juez que presida dicha sala en ese momento, o el Juez podrá ordenar su traslado a la sección o sala correspondiente.

¿Cuál de estas cuatro disposiciones es la que tiene mayor significación para servirle de clave a las tres restantes? Es indudable que la disposición numerada 2 que ordena que "toda acción civil o criminal se presentará en aquella sala del Tribunal situada en el territorio en que hubiere sido radicada bajo la legislación en vigor hasta el presente" es la que tiene mayor eficacia como mandato legislativo y menor conflicto con la legislación vigente. Es indudable que si *todo caso* puede ventilarse *en la sección o sala en que se radique*, queda sin sentido la disposición cardinal que debe ser en aquella sala del tribunal situada en el territorio en que la misma hubiese sido radicada bajo la legislación en vigor hasta el presente.

Ya hemos visto que la organización distinta de los dos tribunales o secciones que constituyen el Tribunal de Primera Instancia, como cuestión de organización aisladamente considerada, o como cuestión de especialidad en la materia concernida aisladamente considerada, no permite esta flexibilidad extrema que presupone la frase "todo caso podrá ventilarse en la sección o sala en que se radique" a menos que no estuviéramos dispuestos a consagrar una total anarquía judicial. Todavía este tribunal no ha procedido a preparar las reglas sobre el traslado de causas para someterlas a la Asamblea

Legislativa para su aprobación final. De manera que la solución en alternativa que contiene la disposición final de la sección 10 y que tal vez pudiera esclarecer esta situación debidamente, no se encuentra al alcance de nuestra judicatura, que si hace uso de la legislación anterior sobre el traslado de causas, no tendría facultad para ordenar el traslado de una sección a otra, porque anteriormente nuestra legislación procesal no lo permitía.

Siendo ésta la situación, nos parece que siguiendo la línea de pensamiento contenida en la disposición numerada 2 en el sentido que no se desestimará ningún caso fundado en haberse sometido a una sección *sin jurisdicción*, o a una sala de un tribunal sin competencia para ello, se permita, mientras una organización más uniforme de todos nuestros tribunales no se produzca, que sólo puede verse el caso por convenio de las partes *cuando se haya radicado en una sección con competencia* dada expresamente por la ley en vigor, aunque la sala sea distinta, a aquella sala del tribunal situada en el territorio en que la misma hubiese sido radicada, bajo la legislación en vigor hasta el presente, pues habiéndose constituído todo el territorio de Puerto Rico en un solo distrito judicial, la división por salas ha perdido toda su virtualidad en cuanto a jurisdicción territorial se refiere, aunque no ha perdido ninguna en cuanto a jurisdicción sobre la materia (competencia), se refiere.

Ahora bien, la propia sección 10 de la Ley número 11 de 24 de julio de 1952 no permite, como cuestión de derecho a opción de un solo litigante, radicar cualquiera acción civil *en cualquiera sala* de la sección competente, si no que dispone que dicha acción debe radicarse "en aquella sala del tribunal situada en el territorio en que la misma hubiese sido radicada bajo la legislación en vigor hasta el presente", y condiciona la excepción que pueda verse en una sección o sala distinta a un "convenio de las partes y a la anuencia del juez que presida dicha sala en ese momento".

No podemos estar conformes con la afirmación que el convenio de las partes pueda ser expreso o tácito, y que basta la no comparecencia de una parte para que cualquiera sala de cualquier sección pueda seguir conociendo de una materia sobre la cual la propia ley le niega expresamente competencia. La última disposición de la sección 10 no contempla un caso de sumisión ordinaria a un tribunal con competencia para conocer de ciertas materias. Contempla un caso de sumisión extraordinaria a un tribunal sin competencia para conocer de ciertas materias. Hasta cierto extremo, dicha sumisión disloca casi todas las finalidades de orden público que se propone un estatuto de organización judicial. En el supuesto de que bastara la voluntad de los litigantes y la anuencia del juez para alterar la distribución de la tarea judicial ordenada por el propio estatuto, tal sumisión debe ser expresa y por escrito.

La determinación por ley del sitio donde debe ventilarse un litigio es una verdadera conquista del pueblo. En la historia del procedimiento marca un momento ascencional en la justicia debida a los humildes. Tal vez su origen pudiera trazarse al momento mismo en que los testigos patriarcales (community witnesses) daban fe de ciertos hechos de conocimiento general en la comarca, que formaba parte de la "prueba". Tal vez la institución del jurado en materia civil, con el supuesto de un conocimiento superior de la costumbre (fuero), pudiera encontrarse en la génesis de la institución. El derecho a ser juzgado dentro del sitio de la propia residencia, o cerca del lugar donde están radicados sus bienes, no es un arcaísmo sin sentido, sino el producto de una lucha contra las manipulaciones de la Curia Regis, contra la centralización del Fuero Real, para mantener la justicia al alcance de la mano del perdidoso tradicional.

Es cierto que en el caso que nos ocupa, tanto la sala de Caguas como la Sala de Guayama del Tribunal Superior del Tribunal de Primera Instancia, tenían competencia para conocer del expediente de dominio. Pero de acuerdo con la legislación anterior, dicho expediente ha debido tramitarse en

aquella sala del Tribunal Superior situada en el territorio en que radicaran dichos bienes. La última disposición de la sección 10 se ha aplicado partiendo del principio que basta la radicación en otra sala distinta, la no comparecencia de ningún opositor y la pasividad del juez que entendió en la vista, para que se produzca un caso de sumisión tácita. Con esta aseveración no puedo estar conforme. La no comparecencia del opositor en derecho en expedientes de jurisdicción voluntaria, o la rebeldía del demandado en casos civiles ordinarios, no puede interpretarse como el caso de sumisión extraordinaria que contempla la última disposición de la sección 10.

Casualmente el caso que nos ocupa tiene implicaciones claras y precisas sobre la deseabilidad de no trastornar, más allá de lo rigurosamente necesario, el profundo valor humano de la distribución foral. Si hemos de considerar la última disposición de la sección 10 como una posibilidad para el ejercicio de una buena discreción judicial, es indudable que siempre constituiría una base mejor para la discreción judicial darle a los opositores en título una mejor oportunidad, a un costo menor, de oponerse al derecho del peticionario. Disiento.