CÁNDIDO VÁZQUEZ y OTROS, recurrentes, *v.* ADMINISTRACIÓN DE REGLAMENTOS Y PERMISOS, OFICINA REGIONAL DE ARECIBO, PUERTO RICO, recurrida.

*Número:* CE-86-382 *Resuelto:* 13 de junio de 1991

514

*Ángel M. Bonnet Rosario*, abogado de los recurrentes; *Sonia L. Del Toro*, abogada de la *Administración de Reglamentos y Permisos*, recurrida; *Emilio Vidal Pérez Rosado*, abogado de la *Junta de Planificación* interventora y recurrida; *Milagros Arrieta Díaz*, abogada de la *Junta de Apelaciones sobre Construcciones y Lotificaciones*, recurrida.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

El presente caso nos permite precisar, no sólo el concepto *lotificación simple*, sino también lo que constituye *finca principal* o *predio original* para efectos del cómputo de los solares, predios o parcelas de terreno que tipifican una *lotificación simple*. Art. 3 de la Ley Orgánica de la Junta de Planificación de Puerto Rico, Ley Núm. 75 de 24 de junio de 1975 (23 L.P.R.A. sec. 62b(*l*)); Art. 3 de la Ley Orgánica de la Administración de Reglamentos y Permisos, Ley Núm. 76 de 24 de junio de 1975 (23 L.P.R.A. sec. 71b(i)).

Ambos estatutos definen el concepto *lotificación simple* de la manera siguiente:

(i) "Lotificación Simple"—es aquella lotificación, en la cual ya estén construidas todas las obras de urbanización, o que éstas resulten ser muy sencillas, y que la misma no exceda de diez (10) solares, *tomándose en consideración para el cómputo de los diez (10) solares la subdivisión de los predios originalmente formados, así como las subdivisiones del remanente del predio original.* (Énfasis suplido.) 23 L.P.R.A. sec. 71b(i).

I

*Los hechos*

El Sr. Bruno Vázquez era dueño de dos (2) fincas ubicadas en el Barrio Carrizales de Hatillo de 63.1227 y 80.10 cuerdas, respectivamente. Al fallecer dejó testamento,[1] en el cual adjudicó las fincas a sus once (11) hijos y a la viuda.

En su alegato, la Administración de Reglamentos y Permisos (en adelante A.R.Pe.) nos hace el siguiente relato de lo acontecido con relación a estas dos (2) fincas.

Para el 1977–1978 la Sucesión de Don Bruno Vázquez some[tió] ante ARPE un proyecto para la lotificación de siete (7) lotes con cabidas de cinco (5) cuerdas o más, de una finca de 63.1227 cuerdas. La solicitud fue denegada por la Oficina Regional de ARPE en Arecibo, en adelante la Regional, toda vez que de la finca ya se habían segregado más de diez (10) solares mediante los casos 1–67–0061 LS, 1–68–0665 LS, 1–72–0669 LS y 1–72–0755 LS, correspon[dientes] a los años 1967, 1968 y 1972.

Posterior a la anterior solicitud, radica[ron] proyecto para la lotificación de trece (13) lotes para la finca de 80.10 cuerdas, el cual [fue] denegado por la Regional toda vez que de la finca original se habían segregado más de diez (10) lotes. Esta finca es la número 2688 en el Registro de la Propiedad.

La Sucesión compare[ció] una vez más a ARPE en 1978 alegando que el causante Don Bruno Vázquez había hecho su testamento a tenor con la disposición reglamentaria que permitía dispensar las

_____

[1] El testamento se formalizó el 10 de enero de 1964.

fincas de cinco (5) cuerdas o más [para fines agrícolas], artículo 5 Reglamento de Planificación Número 3 (Lotificación). [Este Artículo se enmendó el 16 de octubre de 1974, para aumentar la cabida a veinticinco (25) cuerdas.] El Registrador había denegado su inscripción toda vez que la disposición de las cinco (5) cuerdas fue derogada.

En aquel momento la Sucesión levantó un plano a base del testamento y firmó y presentó la escritura al Registro, dos (2) meses después de la enmienda al Reglamento de Lotificación.(2) Alegato parte recurrida, págs. 2-3.

A.R.Pe. denegó las solicitudes.(3) La Sucesión acudió en alzada a la Junta de Apelaciones sobre Construcciones y Lotificaciones (en adelante J.A.C.L.) y ésta refirió los casos a la Oficina de Asesoramiento Legal de A.R.Pe. Luego de los estudios

---

(2) Esta partición testamentaria se hizo tomando en cuenta que a esa fecha la reglamentación permitía las segregaciones de fincas con cabida de cinco (5) cuerdas o más, para fines agrícolas, sin que tuvieran que pasar por el trámite administrativo ante la Junta de Planificación.

La Administración de Reglamentos y Permisos (A.R.Pe.) apoyó su acción en los Arts. 3 y 5 del Reglamento de Lotificación (Reglamento de Planificación Núm. 3, Junta de Planificación de Puerto Rico, 2da rev., 1958, pág. 4-5) que disponían:

"ARTÍCULO 3.— . . . Quedan exentas de las disposiciones de este Reglamento aquellas lotificaciones de fincas en la zona rural, para fines agrícolas, cuando el área, tanto del remanente como de cada una de las nuevas fincas resulte ser de cinco (5) cuerdas o mayor; *Disponiéndose*, que no quedan inclu[i]das en esta disposición de exención aquellas lotificaciones situadas en áreas en que la Junta determine que las posibilidades de extensión urbana así lo exigen.

. . . . . . . . . .

"ARTÍCULO 5.— . . . Cuando de la Declaración de Intención de Lotificar se desprenda que se trata de la *lotificación de una finca en la zona rural, para fines agrícolas*, en que el remanente, o cualquiera de las nuevas fincas, resulte con área menor de cinco (5) cuerdas, la Junta podrá expresamente dispensar tal lotificación de cumplir con las disposiciones del presente Reglamento.

. . . . . . . . . .

"El Registrador de la Propiedad, antes de aceptar estas lotificaciones para registrarlas, requerirá de la parte interesada la certificación expedida al efecto por la Junta." (Énfasis en el original.)

(3) A.R.Pe. entendió que de ambas fincas, la de 63.1227 y la de 80.10 cuerdas, se habían segregado más de diez (10) lotes de la finca principal; que la finca principal radicaba en una zona de alta productividad agrícola; "[q]ue el desarrollo propuesto [podía] crear en el futuro un núcleo de solares desorganizados y desarticulados carente del orden y formación de solares reglamentarios", y "[q]ue no se presentó información real de lo existente sobre terreno, según [fue] constatado por el informe de campo y estudio del caso". Apéndice, *Exhibit* II, pág. 2. Con relación al segundo proyecto en la finca de 80.10 cuerdas, ofreció una razón adicional para denegar el permiso: "[q]ue los accesos propuestos para este proyecto constituyen accesos inadecuados y de formas físicas inapropiadas. Se proponen accesos de 4.00 metros de ancho". Íd.

legales correspondientes, A.R.Pe. finalmente aprobó las segregaciones de las fincas y éstas, mediante decisión de 7 de julio de 1978, fueron dispensadas de cumplir con los reglamentos de planificación. A.R.Pe. también indicó que los lotes así segregados podían "ser inscritos [en el Registro de la Propiedad] sin que [fuese] necesario el que se proce[saran] como casos de lotificaciones simples". Apéndice, *Exhibit* II, pág. 3. Fundó dicha determinación en que el testamento y el plano de subdivisión de terrenos que acompañó al mismo fueron preparados antes de que se enmendara el Reglamento de Planificación Núm. 3 de 1944, conocido como el Reglamento de Lotificación, "que permitía la segregación de lotes de 5.00 cuerdas [para fines agrícolas] sin la intervención de la Junta de Planificación antes y la Administración de Reglamentos y Permisos en la actualidad". Íd. Al así actuar, A.R.Pe. permitió la inscripción en el Registro de la Propiedad de veinte (20) segregaciones de las fincas originales.

De la finca de 80.10 cuerdas, que es la que suscita la controversia planteada ante nos, se segregaron once (11) lotes,(4) entre los cuales estaban los siguientes:

| | |
|---|---|
| "A" Herminio Vázquez | 5.0019 cuerdas |
| "C" Luis Vázquez | 5.0002 cuerdas |
| "D" Cándido Vázquez | 5.0002 cuerdas |

Así las cosas, en el 1980 el Sr. Luis Vázquez presentó ante A.R.Pe. un proyecto de lotificación para cuatro (4) lotes más el remanente, cinco (5), a ser segregados de la misma finca de cinco (5) cuerdas previamente eximida por A.R.Pe. La solicitud fue denegada por A.R.Pe. toda vez que entendió que de la finca original se habían segregado en exceso de diez (10) lotes. No conforme con la decisión, el Sr. Luis Vázquez apeló a la J.A.C.L., que mediante el caso 80–028-AL autorizó la segregación aun cuando de la misma resolución surgía que de la propiedad se habían segregado más de diez (10) lotes. De esta decisión, lamentablemente, A.R.Pe. no solicitó la oportuna revisión.

---

(4) En realidad se aprobaron catorce (14) lotes en total, porque A.R.Pe. dio su aprobación a dos (2) lotes de menos de cinco (5) cuerdas más el remanente.

En 1981, el Sr. Cándido Vázquez sometió ante A.R.Pe. un proyecto de lotificación de su finca para formar cuatro (4) solares adicionales (Caso Núm. 81–05–C–842–APL); su hermano Herminio sometió un proyecto para la lotificación de dos (2) solares (Caso Núm. 81–05–C–448–APL), y Luis presentó un proyecto para lotificar seis (6) solares (Caso Núm. 81–115 AL en J.A.C.L.). A.R.Pe. no consideró las solicitudes como *lotificaciones simples*, pues determinó que ya se habían segregado en exceso de veinte (20) solares de la finca principal.(5)

No conformes con la decisión, los interesados apelaron ante la J.A.C.L. Ésta denegó el remedio solicitado por entender que carecía de jurisdicción. Posteriormente reconsideró y asumió jurisdicción.(6) A.R.Pe. solicitó reconsideración. Esta fue denegada el 20 de diciembre de 1984. Inconforme, A.R.Pe. recurrió en revisión ante el Tribunal Superior. Éste confirmó la decisión de la J.A.C.L. Por vía de reconsideración, y luego de la intervención de la Junta de Planificación (en adelante J.P.),(7) el tribunal de instancia dejó sin efecto la sentencia y dictó otra en la que declaró

---

(5) A.R.Pe. había aprobado anteriormente varias segregaciones de esta finca de 80.10 cuerdas: un (1) lote, el 24 de junio de 1977, en el Caso Núm. 77–05–D 484 APL; cuatro (4) predios o lotes, el 30 de julio de 1979, en el Caso Núm. 76–05–C 687 APL y, en el caso específico de Luis A. Vázquez, la Junta de Apelaciones sobre Construcciones y Lotificaciones (en adelante J.A.C.L.) autorizó mediante Resolución de 29 de mayo de 1980, en los Casos 80–028–AL y 80–042–AL, la formación de cuatro (4) lotes, con lo cual revocó a la Regional de A.R.Pe. que se había declarado sin jurisdicción por haberse segregado más de diez (10) lotes de la finca principal o predio original.

(6) En esta etapa fueron consolidados los tres (3) casos de los hermanos Vázquez para propósitos de la decisión administrativa.

(7) La Junta de Planificación (en adelante J.P.) compareció a petición del propio tribunal. Argumentó en su alegato que de la finca principal de 80.10 cuerdas se habían formado veintitrés (23) lotes, los que sumados a los doce (12) ahora propuestos daban un gran total de por lo menos treinta y cinco (35) lotes.

Sostuvo que ni A.R.Pe. ni la J.A.C.L. tienen jurisdicción. Arguyó que aun cuando se consideraran aisladamente los lotes propuestos que motivaron esta acción —doce (12) solares, que junto al remanente suman trece (13)— en una *lotificación simple* sólo pueden formarse diez (10) lotes como máximo.

Indicó, además, que la J.A.C.L. interpretó equivocadamente lo que constituye finca original o finca principal y que, para efecto de computar los solares o parcelas que componen una *lotificación simple*, se empieza a contar desde el 4 de septiembre de 1944, fecha en que entró en vigor el Reglamento de Lotificación. Por ello, toda finca segregada o lotificada con posterioridad a esa fecha no constituía una finca principal o predio original, y cuenta entonces para el cómputo de los diez (10) solares.

Expresó su preocupación a los efectos de que en este caso, mediante la utilización de subterfugios, lo que se ha pretendido es urbanizar esa finca y la J.A.C.L. no tiene facultad

que la J.A.C.L. carecía de jurisdicción en estos casos. Los hermanos Vázquez instaron recurso de revisión, planteando la comisión de dos (2) errores:

> (1) Erró el Tribunal al aplicar erróneamente la definición de "lotificación simple" al presente caso y resolver que la Junta de Apelaciones sobre Construcciones y Lotificaciones carece de jurisdicción para entender en el mismo.
>
> (2) Erró el Tribunal sentenciador al negarse a aplicar la doctrina de "cosa juzgada" bajo los hechos de este caso. Solicitud de revisión, págs. 3–4.

## II

### Interpretación estatutaria

 Recientemente reiteramos que es principio cardinal de hermenéutica que "[a]l interpretar una disposición específica de una ley, los tribunales deben siempre considerar cuáles fueron los propósitos perseguidos por la Asamblea Legislativa al aprobarla y nuestra determinación debe atribuirle un sentido que asegure el resultado que originalmente se quiso obtener". *Chase Manhattan Bank v. Mun. de San Juan*, 126 D.P.R. 759, 766 (1990). Véanse: *Pacheco v. Vargas, Alcaide*, 120 D.P.R. 404 (1988); R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1987, Vol. II, Cap. 36, págs. 267–270. Nuestra obligación fundamental en estos casos es imprimirle efectividad a la intención legislativa, propiciando de esta forma la realización del propósito que persigue la ley. *Díaz Marín v. Mun. de San Juan*, 117 D.P.R. 334 (1986). Al interpretar y aplicar un estatuto, hay que hacerlo teniendo presente el propósito social que lo inspiró. *Morales v. Adm. Sistemas de Retiro*, 123 D.P.R. 589 (1989); *Riley v. Rodríguez Pacheco*, 124 D.P.R. 733 (1989). También hay que tomar en consideración "que la interpretación de la agencia encargada de la administración de

---

para entender en primera instancia ni a nivel apelativo en casos de urbanización. Tampoco puede autorizar ni dispensar más de diez (10) lotes en casos de lotificación simple.

un estatuto merece deferencia sustancial" y que esta interpretación "no necesita ser la única razonable . . . ésta merecerá deferencia si es razonable y compatible con el propósito [legislativo]". *De Jesús v. Depto. Servicios Sociales*, 123 D.P.R. 407, 418 (1989). Véanse: *Asoc. Médica de P.R. v. Cruz Azul*, 118 D.P.R. 669 (1987); *Tormos & D.A.C.O. v. F.R. Technology*, 116 D.P.R. 153, 160–161 (1985).

### III

*Lotificación simple*

Tomando en consideración los principios de hermenéutica antes esbozados, pasemos ahora a examinar cuál fue la intención legislativa al adoptar el concepto de *lotificación simple* en las Leyes Núms. 75 y 76, *supra*, 23 L.P.R.A. secs. 62 *et seq.* y 71 *et seq.*, respectivamente.

■ Comenzaremos por dejar claramente establecido que la *lotificación simple* es un tipo de *lotificación* donde se hacen menos requerimientos. El concepto más amplio de lotificación se incorporó a nuestro ordenamiento jurídico mediante el Art. 2 de la Ley de Planificación, Urbanización y Zonificación de Puerto Rico, Ley Núm. 213 de 12 de mayo de 1942 (23 L.P.R.A. ant. sec. 2). En ese entonces se definió como "la división o subdivisión de un solar, predio o parcela de terreno en dos o más partes para la venta o para una nueva construcción, e incluye urbanización como hasta ahora se ha usado en la legislación de Puerto Rico . . .". 1942 Leyes de Puerto Rico 1109.

■ Según Puerto Rico fue desarrollándose de una sociedad eminentemente agrícola a una industrial, este Tribunal tuvo que enfrentarse a varios casos que suscitaron controversia en cuanto a la definición del concepto *lotificación*. *Enríquez v. Registrador*, 65 D.P.R. 407 (1945); *Picó v. Corte*, 66 D.P.R. 159 (1946); *Fortunet v. Junta de Planificación*, 67 D.P.R. 265 (1947); *Martínez v. Registrador*, 73 D.P.R. 210 (1952). Todos, en cierta medida,

provocaron la eventual enmienda a la Ley Núm. 213, *supra*, 23 L.P.R.A. ants. secs. 1–30, por la Ley Núm. 388 de 11 de mayo de 1950, Ley de Planificación y Presupuesto de Puerto Rico, que amplió el concepto:

"Lotificación" significa la división o subdivisión de un solar, predio o parcela de terreno en dos o más partes para la venta, traspaso, cesión, arrendamiento, donación, usufructo, uso, censo, fideicomiso, o para cualquier otra transacción así como para un nuevo edificio e incluye también, urbanización como hasta ahora se ha usado en la legislación de Puerto Rico; y además una mera segregación. 1950 Leyes de Puerto Rico 907.

■ Finalmente, la Ley Núm. 75, *supra*, que derogó expresamente el Art. 2 de la antes citada Ley Núm. 213, amplió aún más dicha definición al añadir a la enumeración hecha en la Ley Núm. 388, *supra*, lo siguiente: ". . . [La] división de herencia o comunidad, . . . la constitución de una comunidad de bienes sobre un solar, predio o parcela de terreno, donde se le asignen lotes específicos a los comuneros; así como para la construcción de uno o más edificios . . . ." 23 L.P.R.A. sec. 62b(k).

Es necesario hacer notar que ni en la Ley Núm. 388, *supra*, ni en su antecesora, la Ley Núm. 213, *supra*, se proporcionó una definición del concepto *lotificación simple*. Éstas sólo proveyeron una definición general del concepto *lotificación*. De otra parte, el Art. 10 de la Ley Núm. 213, *supra*, facultó a la J.P. a adoptar reglamentos que rigieran la lotificación de terrenos en Puerto Rico. En dicho artículo se dispuso:

Al adoptar reglamentos y considerar subdivisiones de terrenos, la junta se guiará por la conveniencia de evitar subdivisiones de terrenos en áreas que no estén listas para tales desarrollos debido a la falta de instalaciones, a la distancia de otras áreas construídas, o a otras deficiencias sociales, económicas y físicas, análogas. A las personas que deseen subdividir sus terrenos, la junta les ayudará a planear la disposición y desenvolvimiento de sus subdivisiones. 1942 Leyes de Puerto Rico 1115.

Este artículo refleja la preocupación que existía en nuestros legisladores ya desde 1942 por que se velara por un desarrollo de

terrenos de forma ordenada y adecuada para una mejor convivencia social.

Al amparo del Art. 10 de la Ley Núm. 213, *supra*, la J.P. aprobó el Reglamento de Lotificación de 6 de junio de 1944 (Reglamento de Planificación Núm. 3). Éste aplicaba a toda lotificación de terreno tanto en la zona urbana como en la rural. *Rivera v. Registrador*, 64 D.P.R. 461 (1945); R. Fuertes, *La lotificación rural y su procedimiento*, X Rev. Gen. Der. Leg. Jur. 182 (1947). En dicho reglamento se dispusieron tres (3) clases de lotificaciones: (1) la división de fincas en la zona rural para fines agrícolas; (2) la urbanización propiamente dicha, y (3) la *lotificación simple*. Esta última se definió como: "aquella división de terreno para venta o construcción que no exija 'la construcción de calles y otras obras de urbanización', y para aprobar las cuales no es por lo tanto necesario se presente a la Junta un plano de construcción". *Picó v. Corte*, supra, pág. 163. Una de las preocupaciones de la J.P. era la posible proliferación de las divisiones de terrenos en la zona rural y, aunque la definición no incluyó un requisito cuantitativo, la agencia había adoptado la práctica de "que el número de parcelas a formarse no sea mayor de dos. Si fuere mayor de dos debe consultarse a la Junta para cerciorarnos que *no se trata de una urbanización en proceso de formarse*". (Énfasis suplido.) Fuertes, *supra*, pág. 184.

■ Sin embargo, no es hasta que se aprueba la Ley Núm. 116 de 29 de junio de 1964 que se incorpora estatutariamente una definición de *lotificación simple* y que se incluye, como requisito cuantitativo, un máximo de diez (10) lotes.

> "Lotificación simple", una segregación, división o subdivisión de un solar, predio o parcela de terreno, en el cual ya estén construidas todas la obras de urbanización, o que dichas obras resulten ser muy sencillas y que no exceda de diez (10) solares. 1964 Leyes de Puerto Rico 382.

■ De esta definición se desprende, al utilizar las palabras "división o subdivisión", que si una finca matriz se dividía, subdividía o segregaba en diez (10) parcelas, no podía una de estas

parcelas o el remanente, a su vez, subdividirse en diez (10) más y acogerse a los beneficios de la *lotificación simple*. De otra parte, si en la primera división de la finca no se completaban los diez (10) solares, entonces se permitía la subdivisión hasta completar los diez (10) lotes mediante el procedimiento de *lotificación simple*. (8)

La discusión legislativa que precedió la aprobación de la Ley Núm. 116, *supra*, refleja esta intención:

> *Sr. Rivera Morales*: En el ejemplo que le expuse hace poco, en caso de una herencia de cuatro cuerdas o de diez cuerdas, ¿podría dividirse sin permiso de la Junta entre los diez herederos o los diez comuneros?
>
> *Sr. Ortiz Ortiz*: Yo entiendo que en lo que se refiere a las lotificaciones simples, según ha sido enmendado, según la enmienda, la Junta no tiene que, o sea, no se aplican los mismos requisitos anteriores. Si esa finca que habla el Compañero tiene menos de diez solares, pues, realmente entiendo que no se aplicaría esa restricción porque está en una excepción expresa que tiene el Proyecto anteriormente. 18 Diario de Sesiones de la Asamblea Legislativa (Cámara), Parte III, pág. 1375 (1964).

■ Ahora bien, el Art. 3 del Reglamento de Lotificación (Reglamento de Planificación Núm. 3, Junta de Planificación de Puerto Rico, 2da rev., 1958, pág. 4), según quedó aprobado en 1944, también exceptuaba expresamente de la aplicación de dicho reglamento "aquellas lotificaciones de fincas en la zona rural, para

---

(8) Alegan los recurrentes que cuando a los miembros de la Sucesión Vázquez González se les adjudicaron sus respectivos predios, estos fueron divididos o segregados de dos (2) fincas de mayor cabida, de 63.1227 y 80.10 cuerdas respectivamente, y que esas primeras divisiones no pueden ser consideradas para el cómputo de los diez (10) solares, por no tratarse de una "subdivisión" como lo dispone la ley, sino de divisiones de las fincas originales.

Fundan su análisis en una interpretación de las palabras "remanente" y "predios originalmente formados" contenidas en la definición de *lotificación simple*. Argumentan que ambas palabras sugieren que primeramente hubo una finca la cual se dividió formando unas fincas individuales que consideran son los predios originalmente formados y un remanente. De manera que es a las divisiones posteriores o subdivisiones de estos predios y del remanente a los cuales les aplica la definición de *lotificación simple*. Según los recurrentes, sostener lo contrario convertiría toda solicitud de segregación en una petición a ser considerada por la J.P. bajo las disposiciones reglamentarias referentes a urbanizaciones. Arguyen, además, que ello podría constituir una privación al disfrute de la propiedad garantizado por la Constitución del Estado Libre Asociado de Puerto Rico. Alegan también que, erróneamente, tanto A.R.Pe. como la J.P. y el tribunal de instancia consideraron como sinónimos las palabras "división" y "subdivisión".

fines agrícolas, cuando el área, tanto del remanente como de cada una de las nuevas fincas resulte ser de cinco (5) cuerdas o mayor . . .". En 1974 se enmendó el Reglamento de Lotificación para establecer "la disposición de que cualquier segregación de 25 cuerdas o menos debe tener la aprobación de la Junta. Esta medida [estaba] destinada a contrarrestar la creciente fragmentación de fincas agrícolas convirtiéndolas en parcelas inadecuadas para tales fines". R. Alonso Alonso, *La nueva Ley de Planificación de Puerto Rico*, IX (Núms. 1–2) Plerus 9 (1975). La enmienda al Reglamento de Lotificación que amplió la cabida de la finca obedeció al hecho de que hubo un sinnúmero de divisiones y subdivisiones de terrenos sin estar sujetas a la reglamentación sobre lotificación. Esto trajo como consecuencia la creación de comunidades sin la debida planificación. En otras palabras, amparándose en la exención que establecía el Reglamento de Lotificación, se estaba burlando la intención del legislador de que se llevara a cabo una planificación ordenada del desarrollo de terrenos. Esto hacía que con el tiempo el Estado tuviese que soportar la carga económica de proveer la infraestructura necesaria a esas comunidades no planificadas.

En 1975 se aprobaron las Leyes Núms. 75 y 76, *supra*, mediante cuyo esquema conceptual se concibió a la J.P. como la agencia gubernamental con poderes para "guiar el desarrollo integral de Puerto Rico de modo coordinado, adecuado, económico, el cual, de acuerdo con las actuales y futuras necesidades sociales y los recursos humanos, ambientales, físicos y económicos, hubiere de fomentar en la mejor forma la salud, la seguridad, el orden, la convivencia, la prosperidad, la defensa, la cultura, la solidez económica y el bienestar general de los actuales y futuros habitantes, y *aquella eficiencia, economía y bienestar social en el proceso de desarrollo*, en la distribución de población, *en el uso de las tierras* y otros recursos naturales, y en las mejoras públicas que tiendan a crear condiciones favorables para que la sociedad pueda desarrollarse integralmente". (Énfasis suplido.) Art. 4 de la Ley Núm. 75, *supra*, 23 L.P.R.A. sec. 62c.

De otra parte, A.R.Pe. tendría a su cargo la implantación de la política pública que sobre planificación estableciera la J.P. Art. 31(a) de la Ley Núm. 76, *supra*, 23 L.P.R.A. sec. 72c(a). La J.A.C.L., a su vez, se creó como organismo cuasijudicial con facultad limitada para entender, entre otros, "en aquellos casos en que una parte [fuese] directamente interesada o afectada por actuaciones, determinaciones o resoluciones de [A.R.Pe.] en relación con . . . casos y planos de *lotificación simple* . . . . Esta facultad se limita a aquellas decisiones emitidas al amparo de los Reglamentos de Zonificación, *para Lotificaciones Simples, Lotificación* . . .". (Énfasis suplido.) 23 L.P.R.A. sec. 72c(a). Específicamente se dispuso que la J.A.C.L. no tendría facultad para "alterar en forma alguna un Plan de Uso de Terrenos hasta donde éste haya sido adoptado por la [J.P.]; decisiones sobre la ubicación de proyectos, *uso de terrenos*, densidad, a nivel de consulta de ubicación, zonificación y rezonificaciones . . .". (Énfasis suplido.) Íd.

▬▬▬ Tomando en consideración las disposiciones antes mencionadas, tanto la J.P. como A.R.Pe. arguyen que no puede convalidarse la interpretación adoptada por la J.A.C.L. y los recurrentes. Mediante esta interpretación pretenden los recurrentes que unas segregaciones exentas o dispensadas de pasar por el trámite administrativo, por ese sólo hecho, se convierta a cada uno de los lotes así segregados en fincas independientes, principales, matrices u originales, no susceptibles de computarse dentro de los diez (10) lotes que como máximo establece el concepto de *lotificación simple*. Esta interpretación insufla vida a la intención legislativa, haciendo viable el propósito social que la inspiró. *Chase Manhattan Bank v. Mun. de San Juan*, supra; *Morales v. Adm. Sistemas Retiro*, supra; *Riley v. Rodríguez Pacheco*, supra; *Pacheco v. Vargas, Alcaide*, supra; *Díaz Marín v. Mun. de San Juan*, supra; *A.R.Pe. v. Ozores Pérez*, 116 D.P.R. 816 (1986). Además, proviene de las agencias administrativas llamadas, la primera a establecer la política pública relacionada con el uso de terrenos de Puerto Rico y, la segunda a implantarla,

por lo cual nos merecen gran deferencia. *De Jesús v. Depto. Servicios Sociales,* supra; *Asoc. Médica de P.R. v. Cruz Azul,* supra; *Tormos & D.A.C.O. v. F.R. Technology,* supra.

■ No se puede interpretar el concepto de *lotificación simple* como un concepto ajeno o separado del concepto lotificación, y menos aún puede hacerse una interpretación de la ley que propicie el emerger de un sinnúmero de fincas segregadas de otras mayores y pretender de esta forma convertirlas en fincas principales, permitiendo así subsiguientes segregaciones bajo el concepto de *lotificación simple.* Esto provocaría la indeseable desarticulación del sistema de planificación.

■ Resolvemos, pues, que para propósito del cómputo del máximo de diez (10) solares que permiten las Leyes Núms. 75 y 76, *supra,* para la utilización del concepto *lotificación simple* hay que tomar en cuenta cualquier segregación que se haya hecho por lo menos desde 1964, fecha en que entró en vigor la Ley Núm. 116, *supra.* Esta ley estableció el requisito cuantitativo de diez (10) solares, incluso las segregaciones exentas o dispensadas de pasar por el trámite administrativo.

IV

*Efecto de la inscripción en el Registro de la Propiedad sobre la aplicación del concepto "lotificación simple"*

■ Pasemos ahora a considerar qué efecto, si alguno, tiene sobre la controversia en este caso el hecho de que se inscribieran en el Registro de la Propiedad como fincas independientes los predios de terreno segregados de la finca de 80.10 cuerdas que hoy se pretende sean objeto de subsiguientes segregaciones al amparo de las disposiciones sobre *lotificación simple.*

En el caso de autos, de la finca de 80.10 cuerdas, a tenor con las disposiciones testamentarias, se segregaron once (11) lotes de cinco (5) cuerdas, los cuales fueron dispensados de cumplir con los requisitos relativos a *lotificación simple.* El entonces director de

A.R.Pe. entendió que con respecto a éstos, por estar los mismos en zona rural, el Reglamento de Lotificación (Reglamento de Planificación Núm. 3) vigente a la fecha de otorgarse el testamento le concedía la facultad para dispensarlos de los requisitos reglamentarios.(9) De estos once (11) lotes, a su vez, se segregaron nueve (9) adicionales. Los recurrentes arguyen que por haber sido inscritos los once (11) lotes como fincas independientes en el Registro de la Propiedad, de cada una se pueden ahora segregar diez (10) lotes adicionales, respectivamente, utilizando el mecanismo de la *lotificación simple.* No les asiste la razón. Tal interpretación tendría el efecto de burlar todo el esquema vigente sobre la planificación de terrenos en Puerto Rico, propiciando la subdivisión indiscriminada de terrenos sin la debida supervisión gubernamental.

■ Ahora bien, aunque consideráramos que las segregaciones de los once (11) lotes fueron válidamente hechas a tenor con la exención que para zonas agrícolas concede el Reglamento de Lotificación (Reglamento de Planificación Núm. 3), esta es una exención a los únicos fines de no tener que cumplir con los demás requisitos reglamentarios, de manera que pueda inscribirse la propiedad en el Registro de la Propiedad. La ley no distingue entre lotificaciones exentas o no exentas en lo que respecta a la aplicación de las limitaciones cuantitativas de las *lotificaciones simples.*

En una sociedad como la nuestra, donde el recurso de terrenos es cada día más limitado, la planificación del uso de los mismos adquiere gran relevancia. A través de ésta debe velarse por el desarrollo social, económico, físico y ambiental del país. Su uso tiene necesariamente que facilitar unos cambios sociales rápidos, pero siempre teniendo en cuenta que estos beneficios causen las menos perturbaciones sociales e individuales posibles. Alonso Alonso, *supra,* pág. 20.

---

(9) A.R.Pe. utilizó la exención provista en los Arts. 3 y 5 del Reglamento de Lotificación, *supra,* aplicable a la zona rural en casos de segregaciones para fines agrícolas.

532

■ No podemos, por lo tanto, tomar como criterio determinante para la interpretación de lo que constituye "predios originalmente formados" —con el propósito de aplicar el concepto de *lotificación simple*— el hecho de que las fincas de las cuales se pretende segregar los solares se inscribieron en el Registro de la Propiedad. El concepto *finca registral* es distinto al de *finca material*.

Miguel Ángel del Arco Torres nos señala:

> Finca en sentido material es, como dice Doral (*Principios registrales*, Granada, 1982, p. 35), la superficie o espacio delimitado que forma una unidad en el tráfico.
>
> La legislación hipotecaria parece dar por supuesto el concepto material de finca y se limita, por ende, exclusivamente a concretar lo que es susceptible de abrir folio registral.
>
> Es finca, en el sentido registral, todo lo que abre folio especial; la finca registral se determina por tanto, por la inmatriculación. *Diccionario de Derecho Civil*, Pamplona, Ed. Aranzadi, 1984, T. I, pág. 638.

■ Después de todo, la inscripción de los inmuebles es voluntaria y no obligatoria y no siempre coincide la realidad registral con la realidad extrarregistral. De otra parte, la fe pública registral no se extiende a la existencia ni a las cualidades de la finca, como tampoco asegura su cabida. Así mismo "no hay un medio automático de que se incorporen las modificaciones que sufre la finca en el Registro, pues en nuestro sistema las variaciones se hacen constar a instancias de partes interesadas". A. García Martínez, *Algunos aspectos de la lotificación y zonificación en Puerto Rico*, 23 Rev. Jur. U.P.R. 337, 349 (1954).

En el caso de autos se efectuó una segregación o lotificación. Ello conllevó la reducción en cabida de la finca principal, puesto que "[l]a segregación no es más que la separación de una parte de una finca de *su matriz* para constituir una finca distinta".[10] (Énfasis suplido.) *Mattei v. Registrador*, 94 D.P.R. 467, 471 (1967).

---

[10] La Ley Hipotecaria y del Registro de la Propiedad, Ley Núm. 198 de 8 de agosto de 1979, según enmendada, en su Art. 85 (30 L.P.R.A. sec. 2306) utiliza los términos "finca original" y "finca matriz" al señalar lo siguiente:

Véanse, además: *Colón Gutiérrez v. Registrador*, 114 D.P.R. 850 (1983); *Banco Comercial v. Registrador*, 118 D.P.R. 773 (1987).

La inscripción en el Registro de la Propiedad de los once (11) lotes no tuvo el efecto de convertir los lotes segregados de la finca de 80.10 cuerdas en "predios originalmente formados" para propósitos de la aplicación de las disposiciones sobre *lotificaciones simples.*

## V

*Privación del disfrute de la propiedad*

Pasemos ahora a considerar el planteamiento de los recurrentes de que, de no permitirse que se consideren las nuevas segregaciones propuestas como *lotificaciones simples,* esto constituiría una privación al disfrute de su propiedad garantizado por nuestra Constitución. Ciertamente no les asiste la razón.

El derecho de propiedad no es absoluto. Éste ha ido cediendo ante situaciones donde debe prevalecer el bienestar común y el interés público. Con respecto a la planificación de terrenos, específicamente en *The Richards Group v. Junta de Planificación,* 108 D.P.R. 23, 34–35 (1978), sostuvimos que:

> Fue mucho más tarde, en el siglo anterior y en el nuestro, que sobrevinieron los tiempos del *laissez faire,* cuya herencia no se ha disipado enteramente, y en que se concibió la propiedad como un haz de derechos inmutables, prácticamente inmunes al poder del Estado. Desde hace varias décadas esta visión absolutista y petrificada de la propiedad ha venido cediendo. Reich, *The New Property,* 73 Yale L.J. 733 (1964). Hoy podemos decir que la propiedad en las sociedades democráticas tradicionales entraña determinados derechos, pero que estos viven en competencia con-

---

"Cuando una finca inscrita se divida en dos o más fincas, cada una se inscribirá con un número diferente, anotándose en la finca original la división operada.

"Cuando se segregue parte de una finca inscrita para formar una nueva, se inscribirá la porción segregada con número diferente, expresándose esta circunstancia en la finca matriz."

Las segregaciones no dispensadas por A.R.Pe., una vez obtienen la aprobación de la agencia, entran al Registro de la Propiedad.

tinua con otros intereses, privados y públicos, de importancia cambiante y en ocasiones creciente. La extensión de esos derechos y el grado a que tienen que ceder ante otros valores dependen de las circunstancias de cada controversia.

. . . [R]esulta claro en nuestra jurisdicción que el derecho de propiedad no abarca el derecho de urbanizar un predio sin autorización gubernamental, la cual puede condicionarse. . . . Esta doctrina altera la visión tradicional vigente hasta hace relativamente corto tiempo en muchas jurisdicciones sobre la facultad casi inviolable de desarrollar terrenos. (Escolio omitido.)

En el caso de autos, el tribunal aplicó las normas que rigen el uso de terrenos en Puerto Rico. Al así hacerlo, no privó a los recurrentes de su derecho constitucional al disfrute de su propiedad.

## VI

*Jurisdicción de la Junta de Planificación*

Pasemos ahora a considerar qué organismo administrativo tiene jurisdicción sobre la revisión de la determinación administrativa de A.R.Pe.

▬ Una vez establecido que el caso que nos ocupa no es de *lotificación simple*, hay que concluir, necesariamente, que la J.A.C.L. no tiene jurisdicción sobre el mismo. La Ley Núm. 76, *supra*, dispone en su Art. 31 (23 L.P.R.A. sec. 72c(a)), lo siguiente:

La Junta de Apelaciones tendrá facultad para entender exclusivamente en aquellos casos en que una parte directamente interesada o afectada por actuaciones, determinaciones o resoluciones de la Administración de Reglamentos y Permisos en relación con: permisos de construcción y de uso de edificios, permiso de uso de solares, para áreas de estacionamiento; *casos y planos de lotificación simple*; planos de lotificación; casos donde se solicite la dispensa del cumplimiento de requisitos de un Reglamento de Planificación mediante una concesión o autorización directa. Esta facultad se limita a aquellas decisiones emitidas al amparo de los Reglamentos de Zonificación, para Lotificaciones Simples, Lotificación y Edificación de Facilidades Vecinales, Reglamentos

sobre Control de Edificaciones y Desarrollo de Terrenos en Zonas Susceptibles a Inundaciones y de reglamentos de emergencia que cubran asuntos incluidos en el ámbito de revisión de la Junta de Apelaciones *pero no incluye lo siguiente*: decisiones que tengan el efecto de alterar en forma alguna un Plan de Usos de Terrenos hasta donde éste haya sido adoptado por la Junta de Planificación; decisiones sobre la ubicación de proyectos, uso de terrenos, densidad, a nivel de consulta de ubicación, zonificaciones y rezonificaciones; Disponiéndose, *que en el ejercicio de su facultad apelativa, la Junta de Apelaciones velará por que la misma no se utilice con el propósito o resultado de obviar las disposiciones reglamentarias vigentes.* (Énfasis suplido.)

▪ De más está decir que cuando la letra de la ley es clara, la misma no está sujeta a interpretaciones. Art. 14 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 14; *Meléndez v. Tribunal Superior*, 90 D.P.R. 656 (1964): *Pueblo v. Ortega Santiago*, 125 D.P.R. 203 (1990).

El caso de autos, no siendo un caso de *lotificación simple*, tiene que dilucidarse ante la J.P. Esta es la agencia a la que se le confirió el deber y la facultad de planificar el desarrollo de Puerto Rico. La J.A.C.L. no tiene jurisdicción sobre el mismo.

## VII

*Jurisdicción y la doctrina de "cosa juzgada"*

▪ Por último, pasemos a considerar el planteamiento de que el foro de instancia erró al no aplicar la doctrina de cosa juzgada. Esta doctrina se utiliza con el propósito de poner fin a los litigios al no permitir que se someta en más de una ocasión a un ciudadano a las molestias que supone relitigar la misma causa. *Pérez v. Bauzá*, 83 D.P.R. 220, 225 (1961).

Los recurrentes alegan que con posterioridad a sus fincas haber adquirido "estatura de [fincas] independiente mediante la decisión de ARPE de 7 de julio de 1978 . . . ARPE denegó una solicitud de segregación del recurrente Luis E. Vázquez basándose en que ya se habían segregado de la finca original más de 10

solares y la solicitud no cualificaba como segregación simple
. . .[E]ste planteamiento fue rechazado por la [J.A.C.L.] en el
caso número 80-028–AL y ARPE no solicitó revisión judicial de
dicha decisión". Solicitud de revisión, pág. 10. Como resultado de
esto, se le concedió permiso para segregar cuatro (4) lotes del
terreno heredado.

■ Continúan arguyendo que, al ser uno de los recurrentes
Luis E. Vázquez y por estar "envueltas unas segregaciones de la
misma finca o predio que les correspondió por herencia" (íd., pág.
11), y al tratarse del mismo planteamiento de falta de jurisdicción
de la J.A.C.L. por no ser una *lotificación simple*, aplicaba la
defensa de cosa juzgada.(11) No les asiste la razón.

■ Para que aplique la doctrina de cosa juzgada "es nece-
sario que entre el caso resuelto por la sentencia y aquel en que
ésta sea invocada, concurra la más perfecta identidad entre las
cosas, las personas de los litigantes y la calidad con que lo fueron".
Art. 1204 del Código Civil, 31 L.P.R.A. sec. 3343.

Para que prospere la defensa de cosa juzgada es necesario,
además, que la sentencia dictada en el primer pleito haya sido
dictada por un tribunal o agencia administrativa con jurisdicción.
Una sentencia dictada sin jurisdicción "nada significa en cuanto a
los hechos que se pretendieron litigar y en consecuencia no opera
como cosa juzgada (*res judicata*)". *Tartak v. Tribl. de Distrito*, 74
D.P.R. 862, 870 (1953).

En el presente caso se está precisamente ante un plantea-
miento de falta de jurisdicción de la J.A.C.L. sobre la materia, por
no constituir las propuestas segregaciones una *lotificación sim-
ple*. Se está alegando, pues, que la J.A.C.L. carece de autoridad y
poder para atender este asunto.

---

(11) Cabe señalar que el hecho de que una segregación previa haya constituido una
*lotificación simple*, no necesariamente implica que otra posterior cualifique como tal.

Además "un error de un organismo administrativo no obliga a éste, ni impide su
corrección. No se puede pretender, pues, que una actuación administrativa de dudosa
corrección impida a la agencia pertinente que se corrija optando por evitar su repetición".
*Del Rey v. J.A.C.L.*, 107 D.P.R. 348, 355–356 (1978).

█ La falta de este tipo de jurisdicción conlleva las siguientes consecuencias inexorablemente fatales: (1) esta falta de jurisdicción no es susceptible de ser subsanada; (2) las partes no pueden voluntariamente otorgarle jurisdicción sobre la materia a un tribunal ni el tribunal puede abrogársela; (3) los dictámenes de un foro sin jurisdicción sobre la materia son nulos (nulidad absoluta), *Rodríguez v. Registrador*, 75 D.P.R. 712, 716 y 726 (1953); (4) los tribunales tienen el ineludible deber de auscultar su propia jurisdicción; (5) los tribunales apelativos, además, deberán examinar la jurisdicción del foro de donde procede el recurso, y (6) el planteamiento de falta de jurisdicción sobre la materia puede hacerse en cualquier etapa del procedimiento por cualquiera de las partes o por el tribunal *motu proprio, López Rivera v. Autoridad Fuentes Fluviales*, 89 D.P.R. 414, 419 (1963).

Ante un planteamiento de falta de jurisdicción sobre la materia no puede prosperar la defensa de cosa juzgada.

## VII

*Conclusión*

De los hechos en el caso de autos surge, con meridiana claridad, que en las dos (2) fincas de 63.1227 y 80.10 cuerdas, respectivamente, de las cuales se segregaron los lotes objetos de esta revisión, desde el 1964 ya se han hecho en exceso de las diez (10) segregaciones que como máximo se permite para que se pueda utilizar el procedimiento de *lotificación simple.* Al no estar ante un caso de *lotificación simple,* la J.A.C.L. no tiene jurisdicción sobre el asunto.

Por lo tanto, *procede que se dicte sentencia que confirme la emitida por el Tribunal Superior, Sala de San Juan, el 21 de abril de 1986, mediante la cual se revocó la resolución de la J.A.C.L. que asumía jurisdicción en el caso de autos.*

El Juez Asociado Señor Negrón García concurre con el resultado sin opinión escrita. El Juez Asociado Señor Rebollo López no intervino.